(No. 28346.—
PANTHER CREEK MINES, INC., Appellee, *vs.* FRANCIS B.
MURPHY, Director of Labor, (ROBERT L. GORDON, Successor,) Appellant.

*Opinion filed March 21, 1945.*

George F. Barrett, Attorney General, (William C. Wines, of Chicago, of counsel,) for appellant.

Barber & Barber, of Springfield, for appellee.

Mr. Justice Murphy delivered the opinion of the court:

This appeal is prosecuted by the Director of Labor to reverse a judgment of the circuit court of Sangamon county. The judgment appealed from vacated and set aside a decision the Director had made in a proceeding under the Unemployment Compensation Act. (Ill. Rev. State. 1943, chap. 48, par. 217 *et seq.*) The question is as to what should be included in the payroll of the Panther Creek Mines, Inc., as wages paid its employees. The additional contributions exacted, based upon the increased payroll, are for each of the quarters in the years 1940, 1941, and 1942. The case has followed the course of procedure outlined in section 25(a)(1) and (2), (par. 242,) and comes to this court on an appeal from a judgment entered in the *certiorari* proceeding.

Appellee was engaged in the business of selling and mining coal taken from its three shaft mines. Some of the employees, such as track layers, drivers, and timber-

men, were paid on a per diem basis, and others, such as miners, were paid on a tonnage basis. All coal produced was mined and loaded by hand. Following a designation in the record, the men employed for mining work will be referred to as "contract miners." Production of coal by hand mining, as distinguished from strip mining and mechanical mining, required the use of powder, caps and fuses. Appellee purchased supplies for use by its contract miners. Each miner drew from the storehouse the items he needed and all articles thus used were charged to the miners' respective accounts. Appellee maintained a blacksmith shop at each mine, where the mining tools used by the miners were sharpened. This service was also charged to each miner. Every payday the items so charged were deducted from each miner's pay and he received appellee's check for the net balance.

During the three years covered by the report in question, appellee made return and paid contributions on its payroll for its day laborers and the net amount paid the contract miners. It did not report or make contribution on the amounts withheld to cover the cost of the powder, caps, fuses and the blacksmithing. Appellee's dealings with its contract miners included deductions for other items furnished, such as coal and other supplies. Deductions were also made for the purpose of buying defense bonds for the miners. In making its original returns, appellee did not deduct any of these items from its payroll and they are not involved. The gross amount withheld from the contract miners' pay for powder, fuses, caps and blacksmithing used in the three-year period was approximately $200,000. This amount added to appellee's payroll would produce additional contributions, including interest, of $6577.07.

For the period covered, appellee had a collective bargaining contract with the Progressive Mine Workers of America. The first contract covered the period from

April 1, 1939, to March 31, 1941, and the latter from April 1, 1941, to March 31, 1943. These contracts governed the wages and other factors pertaining to the employment. They are detailed and cover many subjects, but the only parts pertinent to this inquiry are those which pertain to the wages paid contract miners and the provisions which refer to the powder and blacksmithing work. There is no material difference between the two contracts on these items, except that the wage scale in the latter is higher than it was in the first. Contract miners were to be paid on a tonnage basis. The price varied during the three-year period by reason of the difference in the scale, but the range was from $.967 to $1.12 per ton. The contracts provided that the contract miners should purchase their powder from the operators, provided it was of standard grade and quality. The price per keg was agreed upon. No reference was made to fuses or caps. The price for blacksmithing was also fixed on a tonnage basis. Evidence was introduced which shows that in fixing the wages in the second contract a basic scale of $1 per hour for all underground workers was agreed upon and in fixing the price per ton for contract miners, the basic scale of $1 was applied and there was added a sufficient amount to pay the miner for powder and blacksmithing, thus leaving him a tonnage rate which would be equal to $1 per hour. This evidence is not disputed. Such evidence was evidently offered on the theory that all contract miners were of equal productive capacity. The evidence also shows that the deduction for powder, fuses, caps and blacksmithing was about 15 per cent of the gross.

Section 2, subparagraph (g), (par. 218,) defines wages, as follows: " 'Wages' means every form of remuneration for personal services, including salaries, commissions, bonuses, and the reasonable money value of all remuneration in any medium other than cash. Where gratuities are customarily received by an individual in the course of

his work from persons other than his employing unit, such gratuities shall be treated as wages received from his employing unit. The reasonable money value of remuneration in any medium other than cash and the reasonable amount of gratuities shall be estimated and determined in accordance with rules prescribed by the Director. Such rules shall be based upon the reasonable past experience of such individuals, such work and such employing units." This subparagraph was amended in 1940, but the provisions added by the amendment did not, as to the questions presented here, change the act from what it had been since 1937. In 1940, several paragraphs were added excluding certain wages from the operation of the act, but it is not claimed that the facts in this case call for the application of any of such exclusion provisions.

The wages paid by an employer to his employees furnish the basis for computing the contributions which the employer shall pay. Likewise, an employee's weekly benefits during periods of unemployment are fixed at an amount equal "to five percentum of the total wages for insured work paid to him" during a certain period. (Section 4(b)(1)(A); par. 220.) Furthermore, an employee's eligibility to benefits depends upon whether he has, during the base period, "earned wages" "for insured work" equal to not less than $225, and with respect to base periods beginning on and after January 1, 1941, whether he has been paid, during the base period, wages for insured work equal to not less than $225. (Section 6(e); par. 222.) Thus it will be seen that the wages paid by the employer and the wages earned or received by the employee furnish the basis upon which the operation of the act depends. They are so related that the definition of wages as stated in section 2(g) should be construed to include the same elements of pay in both cases. In this connection it should be observed that the record shows that in 1939 one of appellee's contract miners applied for and received bene-

fits. The director's referee held that the wages received after deducting for powder, fuses, blacksmithing, etc., was the basis for computing benefits. The decision of the referee in that case is not cited as a precedent binding upon the Director in this case, but it is referred to to illustrate the incongruity of diverse holdings as to what constitutes wages. Since the wages paid and received are the basis of the act, it must be construed in the light of the purpose for which the act was adopted, namely, to alleviate the distress and suffering occasioned by involuntary unemployment.

Appellant contends that the question determined in *Springfield Coal Mining Co.* v. *Industrial Com.* 291 Ill. 408, is so nearly analogous to the one presented in this case that it should control. In that case an employee who was a coal miner suffered accidental injuries resulting in death. Powder, blacksmithing and other items were furnished by the employer and deducted from the employee's gross pay. The question was as to whether the compensation allowable to the widow and next of kin should be computed on the gross pay or the net after the cost of powder and other items was deducted. The factual situation in the two cases is similar. If there is a basis upon which a distinction may be made, it must be found in the wording of the two acts. The statute construed and applied in the former case directed that the basis for computing compensation should be "the annual earnings which the injured person received as salary, wages, or earnings," etc. In the act in question it is stated that "wages" means every form of remuneration for personal services, including salaries, commissions, bonuses, etc. The word "earnings" and the word "wages" might be used in a sense to include the same thing but that is not the case made by these two statutes. In the Workmen's Compensation Act, the word "earnings" is not followed by any qualifying words. In the Unemployment Compensation Act, "wages"

are limited to all forms of remuneration received for "personal service." These latter words, given their usual and customary meaning, would limit wages to include only that remuneration paid for the personal service which the employee furnished the employer. This difference in the statute distinguishes the former case from this. Furthermore, in *Oak Woods Cemetery Ass'n* v. *Murphy,* 383 Ill. 301, we noted that the basic objects sought by the two acts were so far different that decisions construing the Workmen's Compensation Act were of little value as precedents in construing the Unemployment Compensation Act.

The word "wages," when used unqualifiedly to denote the compensation paid to an employee, embraces a larger field of earnings than when the wages are limited to that which is received as remuneration for personal services. These words are a part of the definition of wages and must be given the meaning which the legislature intended. The general purpose of the act, as is stated in section 1, was to alleviate the distress that accompanies involuntary unemployment. In the light of this expressed purpose, it would seem reasonable that the legislature intended to define wages as including only that which came from the employee's personal efforts. This would necessarily apply in fixing the amount of contributions to be paid by the employer as well as determining the weekly benefits to the employee. It would be illogical to hold that the legislature intended to include as a part of the basis for computing contributions and benefits an item of 15 per cent of the gross pay which did not represent personal effort of the employee and was nothing more than a mere exchange of dollars for merchandise. In determining whether the payments made were limited to remuneration for personal services, it is proper to give consideration to factors such as the one that appears in this case, that is that the price per ton of coal mined was fixed with due allowance for the deduction of powder, blacksmithing and other items.

Appellant contends that a construction which fixes the net wages as a basis for computation would render the act unintelligible, meaningless and inoperative, and therefore make it unconstitutional. We do not perceive how such conditions would arise, for the problem of determining what is personal services in any particular occupation should not be difficult. The administration of the act on this particular point might be aided by the promulgation of rules by the Director, under the powers given him, and, with such rules as a guide, there should be no trouble in applying the act to the cases.

The construction given section 2(g) herein is in accord with rulings, opinions and decisions of administrative officers in other States where the statute contained language the same as, or similar to, that embodied in section 2(g). A similar conclusion was reached by the commissioner administering the Federal Social Security Act.

For the reasons assigned, the judgment is affirmed.

*Judgment affirmed.*