(No. 29697.—

LOCAL UNION NO. 11, on behalf of Claimant-Members, Appellant, *vs.* ROBERT L. GORDON, Director of Labor, *et al.*, Appellees.

*Opinion filed January 22, 1947—Rehearing denied March 17, 1947.*

SMITH, J., dissenting.

C. C. DREMAN, of Belleville, and G. WILLIAM HORSLEY, of Springfield, for appellant.

GEORGE F. BARRETT, Attorney General, (ALBERT E. HALLETT, of Chicago, of counsel,) for appellees Director of Labor *et al.*

Mr. JUSTICE WILSON delivered the opinion of the court:

This case arises under the Unemployment Compensation Act and originated in a controversy concerning the construction of the terms of a supplemental contract between Local No. 11, Progressive Mine Workers of America, and Panther Creek Mines, Inc. The contract, dated August 24, 1944, arranged a schedule of monthly installment payments for the liquidation of past-due vacation and portal-to-portal pay, for which the company was liable under the provisions of a master contract between the Coal Producers' Association of Illinois and Progressive Mine Workers of America, District No. 1. On August 12, 1944, the president of the local union notified the company that the men expected the money due them on August 28, 1944. The company did not pay an installment on August 28, 1944, because, under its interpretation of the contract, no installments were to become payable until September 28, 1944. On the following day, August 29, 1944, the union representatives requested the immediate payment of the installments then due under their construction of the contract and threatened that the men would not report for work if they were not paid. As the consequence of the company's refusal to meet the union's demand, no employees reported for work on the morning of August 30, 1944, and none returned to work until September 11, 1944. This is the period for which claims for unemployment compensation were filed.

After an investigation of the claims, a deputy for the Division of Placement and Unemployment Compensation of the Department of Labor made a determination that claimants were ineligible for benefits under section 7(d) of the act. Local No. 11, Progressive Mine Workers of America, for and on behalf of its claimant-members, appealed from this determination to the Director of the Department of Labor. The Director designated a representative to hear the appeal. Testimony was taken and,

on February 28, 1945, the representative filed his report recommending that the claims be denied. On March 13, 1945, the Director confirmed the report. By writ of *certiorari,* the union appealed from the decision of the Director to the circuit court of Sangamon county. From a judgment of the circuit court, rendered January 7, 1946, affirming the decision of the Director, the union, on behalf of its claimant-members, prosecutes this appeal.

Panther Creek Mines, Inc., is a small corporation engaged in the operation of three coal mines in the Springfield area, only one of which, Mine No. 2, is involved in the present controversy. There, the company employs approximately 130 production and maintenance workers, the present claimants, all of whom are members of Local No. 11 of the Progressive Mine Workers of America. Despite the heavy demand of the war years the mine was shut down for lack of orders in April, 1944, and did not reopen until August 21, 1944.

The background of the controversy is found in the vacation-pay provisions of the then applicable master contract between the Coal Producers' Association and Progressive Mine Workers of America, District No. 1, which governed wages, hours and working conditions at the mine. So far as pertinent, the master contract provided:

"Token payment: In view of the national emergency now existing, and for other reasons, we agree there shall be no stoppage of work for a vacation, and in lieu of such vacation, the operators agree to pay a maximum 'token payment' of $50.00 per year for the term of this contract. An employee eligible to the 'token payment' must have an employment work record of one year's standing with the company involved immediately prior to July 1st of each year. * * * The 'token payment' year shall be from July 1st through June 30th, and the payment shall be made not later than July 30th of each year during the term of this contract."

Vacation pay thus fell due on July 30, 1944. The circumstances of the mine being shut down when the token payment became due and the conceded financial inability

of the company to make the lump-sum payment required by the master contract were the two influential factors resulting in the execution of the supplemental contract of August 24, 1944. The agreement, exclusive of a recital of installment payments due after October 1944, reads as follows.

"The following schedule represents arrangement to pay the $50.00 vacation payment and $52.50 portal to portal pay to the miners employed by Panther Creek Mines, Inc., Local No. 11. The total sum is $102.50. Eligibility to be determined by the contract.

| | Amount Paid to Date |
|---|---|
| $7.00 paid on July 28, 1944, Vacation Pay | $ 7.00 |
| $8.00 to be paid Aug. 28, 1944, Vacation Pay | 15.00 |
| $10.00 to be paid Sept. 28, 1944, Vacation Pay | 25.00 |
| $10.00 to be paid Oct. 28, 1944, Travel Time Pay | $10.00 |

\* \* \*

"At a mine where an employee is either temporarily or indefinitely out of work the monthly payments will be held up until such time as he may notify the company that he wants to be paid. He will then be paid all accrued payments on the 28th of that month, providing the company was notified not later than the 15th of the month.

"This agreement entered into on August 24th, 1944.

For the Miners 
 (s) JOE KNOWSKI 

For the Operators 
 (s) THOS. J. GREENAN"

It is not altogether clear from the testimony whether the union's request on August 12, 1944, for payment on August 28, 1944, was a general demand under the master contract or was made in contemplation of the supplemental contract executed twelve days later. The union treated the demand as conforming to the supplemental contract. This is not surprising inasmuch as an identical contract was in force at the other Panther Creek Mines and presumably was the subject of negotiation at Mine No. 2. In any event, no other notification, either collective or individual, was given to the company. On August 28, 1944, the men received their current pay and nothing more. The next

day, the "pit committee" requested the immediate payment of the July 28 and August 28 instatllments, totaling $15.00 per man, and, on the following day, August 30, 1944, made good its threat to close the mine if its demands were not met.

The principal controversy between the company and the union stemmed from the notification provision of the supplemental contract. The company contended that the employees at Mine No. 2 were either temporarily or indefinitely out of work and interpreted the provision as requiring, first, that the men make individual requests for payment and, secondly, that such requests must be made after the date of the contract and prior to the 15th day of the month in which they expected payment. Accordingly, the company took the position that September 28, 1944, was the first date on which the installment payments could possibly become due and then only in the event individual requests for payment were made prior to September 15, 1944. The union insisted that the notification provisions were inapplicable, contending that the employees had not been temporarily or indefinitely out of work and that, in any event, the notice given to the company on August 12, 1944, met the requirements of the contract.

As a result of the continued failure of the men to report for work there was a complete cessation of operations at the mine from August 30, 1944, until the morning of September 11, 1944, when, the company and the union having composed their differences, the men returned to the mine and normal production was resumed. The parties concede that, during this period, no picket line was formed at the mine and that the company had sufficient orders on hand to have kept the mine in continuous operation.

Claimants' applications for benefits have been successively denied by the deputy, the Director of Labor and the circuit court on the ground that their unemployment was due to a stoppage of work resulting from a labor dispute.

Section 7(d) of the Unemployment Compensation Act (Ill. Rev. Stat. 1945, chap. 48, par. 223(d),) so far as relevant, provides: "An individual shall be ineligible for benefits— * * * (d) For any week with respect to which it is found that his total or partial unemployment is due to a stoppage of work which exists because of a labor dispute at the factory, establishment, or other premises at which he is or was last employed, * * *." Since the existence of a complete stoppage of work at the mine is admitted on all sides, the issue presented for decision is whether a controversy over the interpretation of a written contract covering the time of payment of past-due wages, accompanied by the employees' concerted refusal to work in order to compel compliance with their construction of the contract, constitutes a labor dispute, within the meaning of section 7(d) of the statute.

Although the term "labor dispute" is not defined by the Unemployment Compensation Act, its general meaning is not obscure. A broad and flexible definition is found in the Norris-LaGuardia Anti-Injunction Act (U.S. Code Ann. title 29, Labor, sec. 113(c): "The term 'labor dispute' includes any controversy concerning terms or conditions of employment, or concerning the association or representation of persons in negotiating, fixing, maintaining, changing, or seeking to arrange terms or conditions of employment, regardless of whether or not the disputants stand in the proximate relation of employer and employee." Substantially the same definition is incorporated in the National Labor Relations Act. (U.S. Code Ann. title 29, Labor, sec. 152(9).) The term "labor dispute," as it appears in the Illinois Anti-Injunction Act (Ill. Rev. Stat. 1945, chap. 48, par. 2a,) is narrower in the sense that it has been held to apply only to those cases where employees have a dispute with their own employer or to a dispute between groups of employees and employers. (*Ellingsen* v. *Milk Wagon Drivers' Union,* 377 Ill. 76; *Swing* v.

*American Federation of Labor,* 372 Ill. 91; *Meadowmoor Dairies, Inc.,* v. *Milk Wagon Drivers' Union,* 371 Ill. 377.) Because we are concerned here only with a direct dispute between employer and employee, relating to the date of payment of accrued vacation pay, it becomes unnecessary to decide whether the definition of the Norris-LaGuardia Act was adopted by the General Assembly when it enacted our Unemployment Compensation Act. For present purposes, suffice it to hold that a labor dispute, within the meaning of section 7(d) of the act, is any controversy concerning wages, hours, working conditions or terms of employment. It is plain that, under any definition, a labor dispute includes a strike. (*Walgreen Co.* v. *Murphy,* 386 Ill. 32; *Sandoval* v. *Industrial Com.* 110 Colo. 108.) The act itself so provides where it states that "* * * benefits shall not be denied under this Act to any otherwise eligible individual for refusing to accept new work under any of the following conditions: If the position offered is vacant due directly to a strike, lockout or other labor dispute; * * *." Ill. Rev. Stat. 1945, chap. 48, par. 223(c)(2).

While the term "labor dispute" is not expressly defined in the act, the statutory declaration of public policy (Ill. Rev. Stat. 1945, chap. 48, par. 217,) is an invaluable guide to legislative intent. The declaration, in pertinent part, reads as follows: "Economic insecurity due to involuntary unemployment has become a serious menace to the health, safety, morals and welfare of the people of the State of Illinois. Involuntary unemployment is, therefore, a subject of general interest and concern which requires appropriate action by the legislature to prevent its spread and to lighten its burden which now so often falls with crushing force upon the unemployed worker and his family." It is definitely settled that, by this section, the legislature intended only those who were involuntarily unemployed should receive unemployment compensation. (*Walgreen Co.* v. *Murphy,* 386 Ill. 32; *Caterpillar Trac-*

*tor Co.* v. *Durkin,* 380 Ill. 11.) It is apparent that section 7(d) was incorporated to more explicitly effectuate the declared policy of the General Assembly against the payment of benefits to the voluntarily unemployed.

To obtain a reversal, appellant contends that the controversy over the correct interpretation of the notification provisions of the supplemental contract, accompanied by claimants' refusal to report for work, does not constitute a labor dispute. As a corollary, it is asserted that claimants were involuntarily unemployed. Appellant argues that there was no strike because there was no picket line; that the controversy between the company and the union was not a true labor dispute because it related to back pay rather than to the more common demands for higher wages, shorter hours and better working conditions, and that, as a consequence of the company's refusal to pay the first installment of vacation pay when it fell due, claimants had no assurance that they would ever be paid their vacation pay or for future work performed and, therefore, became involuntarily unemployed.

Appellant's arguments are neither persuasive nor convincing. We have recently held that a strike may be generally defined as a stoppage of work by common agreement for the purpose of obtaining or resisting a change in the conditions of employment. (*Walgreen Co.* v. *Murphy,* 386 Ill. 32.) Picketing forms no part of this definition. It is common knowledge that a strike may or may not be accompanied by the establishment of a picket line. On the other hand, picketing may exist in the absence of a strike. (*Swing* v. *American Federation of Labor,* 372 Ill. 91; *Meadowmoor Dairies, Inc.* v. *Milk Wagon Drivers' Union,* 371 Ill. 377.) In the present situation, the mine was a closed shop and depended entirely on union labor for its operation. Without fear of replacement by rival or non-union labor, it would have been little more than an idle gesture to assign men to picket duty.

On the other side of the picture, there is much positive evidence of a strike. Admittedly, there was a stoppage of work by all production and maintenance employees. Manifestly, the work stoppage resulted from common agreement among the men. The "pit committee" threatened the mine superintendent on August 29, 1944, that the men would not report for work the following day if their demands were refused. Although there was no union meeting nor strike vote, it is absurd to believe that coincidence played any part in the concerted refusal of all 130 employees to report for work on August 30, 1944.

In denying that there was a strike or labor dispute, appellant really hinges its case on the proposition that the stoppage of work by common agreement was not for the purpose of obtaining a change in the conditions or terms of employment at the mine. Appellant argues that employees have a right to quit, either singly or in a body, where an employer refuses to pay past-due wages and that, under such circumstances, the employees must be considered involuntarily unemployed. It is undoubtedly true that where, because of the employer's refusal or inability to pay past-due wages, an employee or all employees quit with the intention of seeking other employment, there is no strike or labor dispute within the meaning of the act. The situation which obtained in the present case differs in two material respects. Not only did claimants have no intention of seeking work elsewhere, as evidenced by their return to the mine on September 11, 1944, but also there was no outright refusal on the part of the company to pay past-due wages. Current wages were paid on the regular payday. Appellant admits that there was no controversy as to whether the company was obligated to make a token payment of $50 to each of its 130 employees in lieu of a vacation. Nor did the company ever deny its contractual duty to make the token payment. The sole controversy between the disputants concerned the time when the first

installment of vacation pay was to become due and payable. In their interpretation of the contract executed August 24, 1944, the company and the union differed by one month as to when the first payment was due. This was a controversy concerning terms and conditions of employment. Claimants' concerted refusal to work for the purpose of coercing the company into abandoning its own, and adopting the union's, construction of the contract amounted to a strike. Likewise, it was a labor dispute, within the purview of section 7(d) of the Unemployment Compensation Act. Where action is taken by either a labor organization or employer having a bearing upon a controversy as to wages, or conditions of employment, a labor dispute has developed. *Dallas Fuel Co.* v. *Horne,* 230 Iowa, 1148.

Our conclusion is strongly supported by *Deshler Broom Factory* v. *Kinney,* 140 Neb. 889, where the Supreme Court of Nebraska made these singularly applicable observations: "Conceding for the sake of argument that the claimants in this case stopped work because they had not been paid their past-due wages, that fact does not necessarily preclude a finding that a labor dispute existed. If the employees had quit with the purpose of seeking other employment and of enforcing their claims for wages in the courts, there would have been no labor dispute within the meaning of the law. But this they did not do. They attempted to enforce collection by concerted, coercive action against the employer. They attempted to force collection by closing down the factory and to gain their desired ends by producing in the mind of the employer a fear of subsequent losses that would naturally result from a sudden stoppage of business. The formation of picket lines shows the intention of claimants to coerce the employer by attempting to keep the factory from operating after they had quit. Their conduct and actions indicate clearly that they retained an expectation to return to work when the object of the walkout was successfully completed. The

fact that the purpose of the walkout may have been the collection of past-due wages makes it no less a labor dispute under the circumstances shown. The means employed were identical with those ordinarily used to obtain a closed shop, better wages, shorter hours or better working conditions. It was simply a labor dispute involving past-due wages instead of future wages. In brief, disqualification under the act depends upon the fact of voluntary action and not the motives which brought it about. Clearly, it was a labor dispute within the meaning of section 48-705, Comp. St. Supp. 1939."

Lastly, claimants fail to meet the test of involuntary unemployment. The policy motivating the enactment of unemployment legislation is the alleviation of economic insecurity incident to involuntary unemployment resulting from depressions and work shortages. (Ill. Rev. Stat. 1945, chap. 48, par. 217.) During the entire period for which claimants seek unemployment benefits the mine had enough orders for coal so that there was sufficient work to keep all those who were willing to work busy and occupied. Claimants' unemployment resulted from their voluntary idleness. By refusing to report for work claimants exercised their right to use economic coercion to enforce their construction of the supplemental contract on their employer. To impute to the General Assembly an intent to grant unemployment benefits for this type of idleness would, in effect, attribute to the legislature an intent to finance strikes out of unemployment compensation funds. *Walgreen Co.* v. *Murphy,* 386 Ill. 32; *Bledsoe Coal Co.* v. *Review Board,* 221 Ind. 16; *Board of Review* v. *Mid-Continent Petroleum Corp.* 193 Okla. 36.

We hold that the unemployment of claimant-employees during the period from August 30 through September 9, 1944, resulted from their voluntary participation in a stoppage of work due to a labor dispute at the establishment at which they were employed. They thereby disqualified

themselves from eligibility for benefits under the Unemployment Compensation Act.

This opinion is not to be construed as authority for prosecution of claims for unemployment compensation by a union. The propriety of its representation of the employees of the coal company in this case has not been challenged.

The judgment of the circuit court of Sangamon county is affirmed.

*Judgment affirmed.*

Mr. Justice Smith, dissenting:

In my opinion there was no labor dispute involved and the employees were entitled to unemployment compensation as claimed. For this reason, I cannot concur in the foregoing opinion.