(No. 29997.—

SOPHIA SALLY FASH *et al.*, Appellees, *vs.* ROBERT L. GOR-
DON, Director of Labor, *et al.*, Appellants.—(MONT-
GOMERY WARD & Co., INC., Separate Appellant.)

*Opinion filed Sept. 18, 1947—Rehearing denied November 17, 1947.*

GEORGE F. BARRETT, Attorney General, of Springfield,
(ALBERT E. HALLETT, of Chicago, of counsel,) for orig-
inal appellants.

STUART S. BALL, JOHN A. BARR, and WILLIAM B. POWELL, all of Chicago, for separate appellant.

FRANCIS HEISLER, JULIUS LUCIUS ECHELES, and ESTHER J. MOHR, all of Chicago, for appellees.

Mr. JUSTICE GUNN delivered the opinion of the court:

Appellee, Sophia Sally Fash, and others, filed application for unemployment compensation with the Director of Labor, for loss of time from employment from April 12 to April 24, 1944. They were all employees of Montgomery Ward & Co. The claims deputy of the Illinois Department of Labor, who made the initial investigation, found the stoppage of work was due to a labor dispute, and therefore the claimants were not eligible to compensation. An appeal was taken from this determination to an agent for the Director of Labor. He held hearings, and after a consideration of the evidence recommended the decision of the claims deputy be affirmed and the claimants be held ineligible for the benefits during the time of the strike. On December 21, 1944, the Director of Labor confirmed the report of his representatives, and decided claimants ineligible for benefits under section 7(d) of the Unemployment Compensation Act. Ill. Rev. Stat. 1945, chap. 48, par. 223.

Up to December 8, 1943, Montgomery Ward & Co. had a contract with the United Mail Order, Warehouse and Retail Employees of America, hereinafter called the Union, concerning labor relations between the company and the members of the union. The National Labor Relations Board had divided the employees into seven different units for bargaining purposes. Prior to the termination of the contract there was a labor controversy between the company and the union. The questions of grievance procedure, wage increases, seniority, union shop and check-off are some of those involved. The company claimed the

union no longer represented two of the units because a majority of each were not members of the union. The company was willing to renew the contract, and to nego-- tiate as to five of the units, but refused to bargain with or to renew the contract as to the two units, in which it is claimed they did not have a majority of union members. The union submitted the question to the War Labor Board, which recommended that the company extend the contract with the union temporarily, and that the union petition the National Labor Relations Board to hold an election to determine whether it represented a majority of company employees.

The company did not comply with this determination, and on April 12, 1944, the union called a strike. Picket lines were established, and signs and placards carried, indicating a strike was in progress. Members of the union testified that a strike was in progress. A little over half of the employees ceased work and served in the picket line, or in other capacities, aiding the strike. The business of the company fell off from forty-five to seventy-five per cent in different departments. On *certiorari* to the circuit court it was held that the evidence showed the unemployment was due to the stoppage of work, and that a labor dispute existed at the place where the plaintiffs were last employed, but that plaintiffs left such employment because of the company's refusal to obey the directive of the War Labor Board, and hence were not ineligible for benefits under the provisions of section 7(d) of the act. The Director of Labor appeals to this court under the provisions of section 14 of the act.

The appellees contend that a labor dispute did not exist, and the basis of their claim seems to be that a labor dispute ceases to be such after a decision concerning its merits has been determined by a board or government agency, and the employer refuses to abide by such determination. When that event occurs it is claimed the decision or de-

termination of the board or agency may be enforced by a strike, without creating the ineligibility to receive benefits resulting from such stoppage of work existing because of the labor dispute. Appellants contend there was a strike caused by a labor dispute, with consequent ineligibility to employee's benefits for those participating therein.

One of the main purposes of the Unemployment Compensation Act was to relieve hardship caused by involuntary unemployment. (Ill. Rev. Stat. 1945, chap. 48, par. 217; *Caterpillar Tractor Co.* v. *Durkin,* 380 Ill. 11; *Walgreen Co.* v. *Murphy,* 386 Ill. 32; *Lindley* v. *Murphy,* 387 Ill. 506; *Beth Weber, Inc.* v. *Murphy,* 389 Ill. 60; *Panther Creek Mines, Inc.* v. *Murphy,* 390 Ill. 23; *Local Union No. 11* v. *Gordon,* 396 Ill. 293.) Section 7(d) of the act, so far as it pertains to this case is as follows: "An individual shall be ineligible for benefits * * * (d) For any week with respect to which it is found that his total or partial unemployment is due to a stoppage of work which exists because of a labor dispute at the factory, establishment, or other premises at which he is, or was, last employed, * * *." Section 1 of the act is expressly enacted as a guide to the interpretation and application of the statute and the public policy of the State on unemployment. This section emphasizes the menace to society of "involuntary unemployment," and recites "involuntary unemployment requires appropriate legislative action." Section 7 was enacted to require the observance of the public policy that there should be no benefits for voluntary unemployment, except under special circumstances mentioned therein. Thus, benefits where an employee voluntarily quits work, without cause, may not be allowed for a period of four weeks, and may not exceed a total period of four weeks. (Sec. 7(a).) And the same provision is made with respect to the employee who has been discharged for misconduct (sec. 7(b);) and, also, where he causes himself to be ineligible for work, with intent to

avoid any of the disqualifications imposed by the act. Sec. 7(h).

It is true that these grounds of ineligibility are qualified by the allowance of partial benefits after a certain lapse of time, but they all manifest an intention to limit the allowance to partial benefits for unemployment caused by individual voluntary action, and but for a slight portion of the full amount. Section 7(d), however, contains no provision allowing any partial benefits, and in fact, provides that for "total or partial unemployment * * * because of a labor dispute" employees are ineligible to receive benefits. So, the critical point for decision in this case is whether involuntary unemployment can arise out of a stoppage of work because of a labor dispute.

The dictionary meaning of the word "involuntary" is: "not proceeding from choice; unwillingly, or under compulsion." No one disputes that the action of the appellees was voluntary, proceeded from choice, and not unwillingly or under compulsion, so do the circumstances here render the employer liable to be properly charged with creating a work stoppage, or did the stoppage occur for other reasons than because of the labor dispute? The statute does not differentiate between the stoppage of work caused by the employer and one brought about by the employees, provided the stoppage is caused by a labor dispute. While it is probable that most stoppages of work caused by a labor dispute arise from a strike of the employees, yet it may occur from the employer's inability to operate because of matters arising out of the labor dispute. But, the statute plainly says the employee is ineligible for benefits if the work stops because of such labor dispute. The statute does not undertake to consider which party is responsible for the stoppage, the material element being is there a stoppage of work caused by a labor dispute?

This seems to be in line with the denial of benefits where an employee is discharged for cause, his unem-

ployment in such case being attributed to his own action. So, if a labor dispute results in the employer closing his plant or factory the statute does not place the blame, but considers such unemployment caused by a labor dispute, and therefore not involuntary unemployment. In the present case there was a labor dispute before December 8, 1943. It involved the renewal of a labor contract between the company and the union. If the subject matter of the contract is terms and conditions of employment a labor dispute is involved and remains involved until an agreement is reached, or the work stoppage ended. Grievance procedure, wage increases, seniority, union shop and check off of dues, as well as the renewal of the contract, were pending. The union wanted a temporary renewal of the contract so it could negotiate its demands. The company agreed to a temporary renewal as to five units, but refused as to two others. The War Labor Board decided in favor of the union and directed the company to sign a temporary renewal contract. The legal effect of the order was advisory. The company refused to sign. If it had signed there would have been a temporary agreement concerning employment. When the company refused to sign, more than fifty per cent of the employees ceased to work, picket lines were established, signs were paraded, and all of the regular accompaniments of a strike existed. The labor dispute existing before the entry of the order of the War Labor Board was not ended then, but existed until the union demands were met, whether at the instance of the War Labor Board or of the union, and the stoppage of work by a strike until the order of the board was obeyed was a strike until the contract governing the labor relations was signed. If the contract was signed the labor dispute ended. There was undoubtedly a labor dispute between the parties, and a strike by the employees to settle it. For the union to announce "we quit because you won't obey the order of the War Labor Board" did not the less mean they quit

because of a labor dispute, because, if the order was obeyed, the dispute was settled in favor of the union.

Practically every question raised in this case is settled by our recent decision in *Local Union No. 11* v. *Gordon,* 396 Ill. 293. In that case we held a labor dispute within the meaning of section 7(d) of the act is any controversy concerning wages, hours, working conditions, or terms of employment. In the instant case the result sought by the union was a contract embodying matters within such definition of a labor dispute. In the case of *Local Union No. 11* the strike was called because of a failure to pay vacation money accrued in the past under a contract, and did not involve any present work controversy. It was a dispute which had originated in the past and had been settled, and a contract to pay executed. The strike was to compel performance of this independent agreement. The same claim was made by the union in that case as here— that there was no stoppage of work caused by a labor dispute between the parties, and hence the members of such union were involuntarily unemployed. We rejected this contention and said: "We have recently held that a strike may be generally defined as a stoppage of work by common agreement for the purpose of obtaining or resisting a change in the conditions of employment," and cited *Walgreen Co.* v. *Murphy,* 386 Ill. 32.

In the present case the union resisted the change and conditions of employment which would follow a termination of the contract between it and the company. In the *Local Union No. 11 case,* in discussing what constituted ineligibility, we said: "appellant really hinges its case on the proposition that the stoppage of work by common agreement was not for the purpose of obtaining a change in the conditions or terms of employment at the mine." But we specifically held that the unemployment resulted from the voluntary participation of the union members in the stoppage of work caused by a labor dispute. In the

instant case the appellees contend that the stoppage of work grew out of a sense of outrage that the company would defy the decision of a government board during the war, and hence the strike was not for the purpose of obtaining any conditions or terms of employment. A comparison of the situation in this case with the situation in the case cited above is unnecessary, except to comment that the surrounding facts and circumstances are far stronger in the present case than in that of *Local Union No. 11*. It is admitted there was a strike, and a labor dispute includes a strike. *Walgreen Co.* v. *Murphy*, 386 Ill. 32.

A major part of appellees' brief is devoted to the argument that the employees of the company stopped work and went on a strike because of the unpatriotic act of their employer. We fail to see a distinction between the acts of the employer and the employees, who did not remedy the situation, so far as the public was concerned, by a walk-out to compel the company to comply with the determination of the War Labor Board and, incidentally, their own labor demands.

While no Illinois decision has been called to our attention, the almost unanimous holdings of jurisdictions where the question has arisen have been that the reasonableness or unreasonableness of the demands, or the merits of the dispute, have no place in the determination of the question whether a labor dispute exists. (*In re Steelman*, 219 N. C. 306, 13 S. E. 2d 544; *Johnson* v. *Pratt*, 200 S. C. 315, 20 S. E. 2d 865; *Board of Review* v. *Mid-Continent Petroleum Corp.* 193 Okla. 36, 141 Pac. 2d 69; *W. R. Grace Co.* v. *California Unemployment Com.* 24 Cal. 2d 720, 151 Pac. 2d 215; *Baker* v. *Powhatan Mining Co.* 146 Ohio, 600, 67 N.E. 2d 714,) and also many other cases cited in appellant's brief.

There is nothing in the statute that the morality or justification of the position taken by either of the contesting parties has anything to do with the eligibility for

benefits, where there is a strike arising because of a labor dispute. The essential element to be considered is the labor dispute and the stoppage of work resulting from the same.

Some contention is made that the test of involuntary unemployment has not been met by the facts. During the entire period for which claimants seek unemployment compensation the company was operating partially. Their various departments suffered from forty-five to seventy-five per cent loss. The employees did not quit for the purpose of seeking other employment. They attempted to enforce the signing of a labor contract by concerted coercive action, to force obedience of an advisory order by closing the business of the employer to gain their desired ends by causing either a closing down of the institution or the loss of business resulting from picket lines around the institution. Their conduct, action and words indicate they expected to return to work when the object of their walkout was successfully accomplished. The object was to compel the execution of a contract favorable to the union, which the War Labor Board had advised the parties to sign.

The means used here were identical with those employed to accomplish the ends and demands in any labor dispute between an employer and its employees. The appellees used their right to employ economic coercion to enforce their demands against the employer. Concerning such a situation, we have said: "To impute to the General Assembly an intent to grant unemployment benefits for this type of idleness would, in effect, attribute to the legislature an intent to finance strikes out of unemployment compensation funds." *Local Union No. 11* v. *Gordon*, 396 Ill. 293.

We can see no discernible difference between the situation in this case and that in *Local Union No. 11* v. *Gordon*. The interposition of the claim that patriotism caused

twenty-five hundred employees at the same time to walk out, and carry banners and placards containing demands for different working conditions and increased wages, and that the unemployment did not occur because of a labor dispute is so casuistic as to merit no further consideration.

The order of the circuit court of Cook County was erroneous, and it is accordingly reversed and the cause is remanded to the circuit court, with directions to quash the writ of *certiorari* issued herein, and to affirm the order of the Director of Labor.

*Reversed and remanded, with directions.*