(No. 30215)
BANKSTON CREEK COLLIERIES, INC., Appellee, *vs.* ROBERT L. GORDON, Director of Labor, *et al.*—(LOCAL UNION No. 118 *et al.*, Appellants.)

*Opinion filed January 22, 1948—Rehearing denied March 11, 1948.*

C. C. DREMAN, of Belleville, and RUMSEY & DENNIS, of Harrisburg, for appellants.

PHILIP M. AITKEN, of Lincoln, Neb., and CHARLES E. COMBE, and DEWITT TWENTE, both of Harrisburg, for appellee.

Mr. JUSTICE GUNN delivered the opinion of the court:

This case involves a claim for unemployment compensation by the employees of Mines 4, 5, 6, 7 and 16 of the Bankston Creek Collieries, Inc., for time unemployed from September 18, 1944, to October 7, 1944. The claim is made by Local Unions Nos. 118, 165, 152, 115 and 170, Progressive Mine Workers of America, on behalf of their members, employees of the appellee, and certain individual employees, all.of whom will be designated appellants.

The claim involves over six hundred men, and was first heard by a deputy of the Illinois Division of Placement and Unemployment Compensation on a demand for unemployment compensation from September 5, to October 7, 1944. The deputy rejected the claim in its entirety, and on review the Director of Labor denied the claim from September 5 to September 18, but allowed it for a period from September 18 to October 7. On *certiorari* the circuit court of Saline County set aside the order of the Director of Labor, holding the appellants were ineligible for compensation under the act. The appeal to this court followed. (Ill. Rev. Stat. 1945, chap. 48, par. 230.) However, appellants now claim only for the period from September 18 to October 7, 1944.

Despite the fact appellants have abandoned the claim for the period from September 5 to September 18, 1944, it is necessary to examine all of the facts from the beginning of the controversy in order to ascertain whether the situation after September 18 materially differs from that prior thereto. On September 5, 1944, a breakdown occurred at Mine No. 6, which prevented an employee named Dunaway from working at his regular job as a truck driver of the road patrol. In order to prevent him from losing several days wages the appellee assigned him to a temporary job which paid $1 per day less than his regular occupation. The pit committee (the governing board of the union in the mines,) questioned this decision, and requested that Dunaway be paid his full rate. At the time the difference amounted to $3. The mine superintendent explained he felt that the contract between the union and the company required the payment of the regular wages for the job he was doing, but urged that the case be made up for decision by the joint board, (a committee made up of representatives of both the union and the operators) as provided for by their wage contract. The appellants declined to handle the dispute in this manner, and on the following morning the seven truck drivers at Mine No. 6 invoked a slowdown practice, as also did the miners at the other mines. This continued, despite the complaint of the president of the Progressive Mine Workers, until September 11, when, because the truck drivers continued to refuse to operate the trucks at the usual rate of speed, they were discharged. One of the drivers stated this trouble would have been avoided if they had paid Dunaway.

From September 11 to September 15, none of the miners at No. 6 mine reported for work, and while the miners reported at the other mines, they engaged in slowdown tactics to such an extent the company was compelled each day to discontinue operations. From September 15 to September 18 none of the miners reported at any mine,

although each was marked as being ready for operation. On September 16 there was a meeting of the workers of all the mines, and, after the meeting, the company was advised that they would return to work September 18 if the discharged truck drivers were rehired. On September 18 the miners at all of the mines, except mine No. 6, started to work on the first shift. At No. 6 mine the miners renewed their demand for the reinstatement of the truck drivers, and the company refused to accede to this demand, insisting that the miners return to work without the truck drivers, so that the issue of their discharge could be taken up with the joint board. After the refusal of the company to rehire the truck drivers, all of the miners at No. 6 mine refused to work and went home. Shortly after the news that the miners at No. 6 mine had refused to return to work, all miners after the first shift quit work, and it was not until October 7 that the miners in all of the mines started to work. The truck drivers were not rehired at that time, but their case was written up and submitted to a joint board, which sustained their discharge.

The facts show without much dispute that the controversy which brought about the stoppage of work commenced on September 5 and continued in various phases until October 7. On September 18, the date upon which appellants claim the controversy was ended, the president and vice president of the union, wired the Solid Fuels Administrator that the dispute between the mines was unsettled, and that there were no signs of a settlement of the disagreement, and asked that someone be sent to assist in settling the controverted question.

Mine No. 6 was a strip mine, and the coal therefrom was hauled in trucks every day to the washer, but the other mines were shaft mines, the coal from some of which was placed on cars, and some of it hauled to the washer. It is claimed by appellants that all of the mines except mine No. 6 were not in operation because of a stoppage of work,

not growing out of a labor dispute, and therefore the workers at these mines at least were entitled to compensation for that reason.

The evidence shows that mine No. 4 worked the first shift on September 18, but after that did not work because it is claimed the president of the union had called it off. Mine No. 5 worked the first shift but did not work thereafter because, as they claim, the mules were taken out of the mine, but the evidence also shows the mules were taken out after the second shift quit work. Substantially the same situation existed in mines Nos. 7 and 16.

The appellants claim that the company created an impossible condition by demanding that a mine be put into operation without truck drivers, and refusing to hire other truck drivers, when they knew that the union could not furnish any truck drivers, and the mines could not produce coal without truck drivers. This is claimed to be based on the contract concerning labor between the miners and the employers, and if the controversy was about the meaning of the wage contract it must necessarily be a labor dispute, because an agreement upon such controversial proposition would put all the men back to work. As a matter of fact the controversy was finally settled, and the miners returned to work on October 7, 1944, although the discharged truck drivers had not been rehired. The proposal finally accepted was suggested by the Federal Conciliator, which was that the Company put No. 6 mine into operation without any truck drivers, pending the handling of the case of the discharged truck drivers.

The evidence shows that the slowdown upon the part of the truck drivers consisted of driving their trucks at the rate of about three miles per hour, when they could properly operate at 25 to 30 miles per hour, and that as a matter of fact, when for a six-hour period they were accustomed to make twenty trips and travel from 65 to 70 miles, they in fact made two trips and traveled approxi-

mately between 6 and 7 miles; or, in other words, they were doing only a small percentage of the work they were supposed to do for their pay. The extent of the slowdown of the work in the mines is not disclosed other than that it was necessary to close the mines because the miners were not doing their accustomed work.

The appellee contends that the trouble originated in a labor dispute at mine No. 6 by a slowdown upon the part of the truck drivers, and upon their discharge all mines started to slow down in sympathy, and this condition existed more or less whenever the mines endeavored to operate, until the settlement of the dispute on October 7, and that therefore the stoppage of work resulted from the voluntary act of appellants, because of the refusal of the appellee to comply with their demands to rehire the seven truck drivers who had been discharged for cause.

Section 7 of the Unemployment Compensation Act (Ill. Rev. Stat. 1945, chap. 48, par. 223,) provides that "An individual shall be ineligible for benefits— * * * (d) For any week with respect to which it is found that his total or partial unemployment is due to a stoppage of work which exists because of a labor dispute at the factory, establishment, or other premises at which he is or was last employed." A slowdown by the truck drivers before their discharge is not denied, nor do we find any denial of the fact that the slowdown occurred in all of the mines at least up to September 18. A slowdown does not seem to be defined, but as the facts above indicate, the moving of the trucks so slowly that the amount of coal being hauled was but a small fraction of the amount customarily delivered at the washer resulted in the truck drivers doing but a small amount of work for the same wages that they would receive for full time and for full production. These men who were thus slowing down the production of the mines, over the protests of their employer and of the president of the union, certainly created a labor dispute.

A slowdown of the material produced by mining operations would come in the same category, and would justify closing of the mines, because it would have the same result as in the case of the truck drivers.

The joint board found that the truck drivers had impeded the work of the mine, and this, with the fact that no appeal was taken from the acts of all of the miners prior to September 18, indicates that there was a labor dispute involved up to that time. After the mass meeting of September 16, to open the mines, the appellee claims the men made it a condition that the drivers be put back to work, but as a counterproposition the appellants said they would allow the company to pick out seven bosses to run the trucks, but, as suggested by appellee, would not pick out twelve truck drivers from among their number, whom the company thought qualified to operate them, but claim this constituted a lockout by the operators. These facts, whichever one may represent the truth, show that the dispute originated out of the truck drivers slowdown acts. Nor does the fact that, as contended by appellants, the company created an impossible condition by requiring the mines be put in operation before the truck drivers case was handled by the joint committee, nonetheless prevent it from being a labor dispute.

The divergent claims of both parties disclose that the dispute was not in fact ended on September 18, but remained unsettled between the parties. The sequence of events shows that the trouble started over paying an employee whose truck was disabled at the rate required by his new work. This involved $3. To compel the payment of this $3 the truck drivers slowed down to not more than ten to fifteen per cent of their capacity of work. After a few days of this slowdown, continuing despite the union officials and over the protests of appellee, they were discharged and the slowdown in the mines resulted in a complete stoppage of work. After September 18 nothing hap-

pened which would have prevented the men at mines Nos. 4, 5, 7 and 16 from working, and Mine No. 6 could have worked ·for a short time until storage space was filled. However, appellants remained out of the mines and ceased work in order to coerce the owners into rehiring the truck drivers, and finally went back to work without insisting that they be rehired but upon a compromise proposition worked out by the Federal Conciliator.

The facts are clear there was a dispute about the wages of one man, and because of the refusal of appellee to rehire the truck drivers, in which respect appellee was finally upheld by the joint committee. None of the miners had any grievances of their own, but their action was taken in sympathy with the drivers who had been discharged, resulting in the stoppage of all work.

A strike involves a labor dispute, but a labor dispute can exist without a strike. (*Local Union No. 11* v. *Gordon,* 396 Ill. 293.) Men quitting work because of a failure to pay agreed sums under a contract for holiday pay is a stoppage of work because of a labor dispute. (*Local Union No. 11* v. *Gordon,* 396 Ill. 293.) Likewise a cessation of work until a new contract is agreed upon has been held noncompensable. (*Bledsoe Coal Co.* v. *Review of Employment,* 62 N.E. 2d 477; *Sandoval* v. *Industrial Com.* 130 Pac. 2d 930.) A walkout has been declared a labor dispute, and a stoppage created thereby prevents the allowance of unemployment compensation. (*National Labor Relations Board* v. *Clinton Woolen Mfg. Co.* 141 Fed. 2d. 753; *Deshler Broom Factory* v. *Kinney,* 140 Neb. 889, 2 N.W. 2d 335.) And so, also, where action is taken either by a labor organization or an employer having a bearing upon a controversy as to wages or conditions of employment, a labor dispute has developed. *Dallas Fuel Co.* v. *Horne,* 230 Iowa, 1148.

A strike has been defined as a cessation of work by employees in an effort to get for employees more favorable

terms. A lockout is a cessation of the furnishing of work to employees in an effort to get for employers more favorable terms. (*Sandoval* v. *Industrial Com.* 130 Pac. 2d 930; *Iron Molders Union* v. *Allis-Chalmers Co.* 166 Fed. 45.) A sympathy strike has been held to render one ineligible for compensation. (*Bernas* v. *Unemployment Com. Board of Review,* 152 Pa. Super, 429, 33 Atl. 2d 258.) The same result is reached for loss of work caused by refusing to go through picket lines. (*Bodinson Mfg. Co.* v. *Commission,* 17 Cal. 2d 321, 109 Pac. 2d 321; *Grace Co.* v. *California Employment Com.* 128 Pac. 2d 633. In view of the facts and the decisions in analogous cases, we entertain no doubt there was a labor dispute between the parties to this controversy within the meaning of section 7(d), that was the cause of the stoppage of work.

In *Local Union No. 11* v. *Gordon,* 396 Ill. 293, and *Fash* v. *Gordon,* 398 Ill. 210, we held that the voluntary stoppage of work for the purpose of obtaining a change in conditions or terms of employment which resulted from a labor dispute is not compensable. In *Fash* v. *Gordon,* 398 Ill. 210, we held that the statute does not differentiate between the stoppage of work caused by the employer and the one brought about by the employees, provided the stoppage of work is caused by a labor dispute. The statute does not undertake to consider which party is responsible for the stoppage, the material element being there is a stoppage of work caused by a labor dispute. From the last-cited case, as well as many others cited therein, it would seem to be the unanimous holding in all jurisdictions that neither the unreasonableness of the demands nor the merits of the dispute have any place in the determination of the question whether the labor dispute actually exists.

The contention by appellants that each of these mines should be considered as a separate entity, as held in *Walgreen Co.* v. *Murphy,* 386 Ill. 32, is not relevant to the

decision of this case, because it appears beyond any question that each of the mines stopped work at substantially the same time, and had no other grievance, other than the failure to rehire the truck drivers. The appellants do not seem to urge that no dispute existed, but rather that the position of the appellee was unreasonable, and that the demands of appellants were reasonable, and should be complied with. As we have pointed out above, under the authorities this makes no difference, provided the controversy between the parties is a labor dispute.

We are not deciding here who should be blamed as between the employer and the employee for the stoppage of work, but we do hold that the stoppage of work arose out of a labor dispute beginning September 5, 1944, and that it continued and was never settled by the agreement of all the parties until October 7, 1944. The evidence does not show that the dispute ended on September 18, but does disclose beyond any question that the matter in controversy between the workers and employer existed until October 7, 1944. The case comes clearly within section 7(d) of the Unemployment Compensation Act, rendering appellants ineligible to receive unemployment compensation for a stoppage of work arising out of a labor dispute.

The judgment of the circuit court of Saline County is accordingly affirmed.

*Judgment affirmed.*