O. DUNAWAY *et al.*, Appellants, v. THE DEPART-
MENT OF LABOR *et al.*, Appellees.

*Opinion filed February 1, 1984.*

Verticchio & Verticchio and J. W. Wenzel, of Gillespie, and G. William Horsley, of Springfield, for appellants.

Neil F. Hartigan and Tyrone C. Fahner, Attorneys General, of Springfield (Rosalyn B. Kaplan, Assistant Attorney General, of Chicago, of counsel), for appellees Department of Labor *et al.*

Glen H. Kanwit, of Chicago, and Charles R. Jelliffe, of Harrisburg, for appellee Sahara Coal Company, Inc.

JUSTICE SIMON delivered the opinion of the court:

Plaintiffs, O. Dunaway *et al.*, filed an action in the circuit court of Saline County for administrative review of a decision of the defendant Department of Labor, which found plaintiffs ineligible for unemployment compensation under section 604 of the Unemployment Insurance Act (Ill. Rev. Stat. 1977, ch. 48, par. 434). The circuit court reversed the decision of the Department of Labor, and the appellate court reversed the circuit court (109 Ill. App. 3d 63). We granted the plaintiffs' petition for leave to appeal to this court (87 Ill. 2d R. 315).

Plaintiffs, coal miners employed by defendant Sahara Coal Company in four locations in southern Illinois, belong to the Progressive Mine Workers of America (PMWA). Sahara is a member of an employers' association known as the Coal Producers' Association of Illinois (CPAI). Sahara and the PMWA were parties to a valid three-year collective bargaining agreement effective from April 10, 1975. On December 6, 1977, another union, the United Mine Workers of America (UMW), initiated a strike against a different group of employers, members of the Bituminous Coal Operators' Association (BCOA). On December 6, UMW pickets appeared at the four Sahara facilities, and the plaintiffs did not cross their picket lines. A few PMWA members worked occasionally at the Sahara mines when no pickets were present, but after these individuals received threatening phone calls from UMW members, they did not return to work. There were no pickets on either December 20,

1977, or January 2, 1978, the days before and after the regularly scheduled Christmas shutdown. PMWA members worked those days and by doing so became eligible for holiday pay.

Although there were no incidents of violence at any of the Sahara facilities, a coal loading dock in Metropolis, 60 miles away, was stormed and blown up by UMW miners. Reports of violence appeared regularly in the local newspapers. Walter Lucas, vice-president of Sahara, testified that on the first day the UMW pickets showed up he told a newspaper reporter that the pickets prevented Sahara's employees from going to work. He conceded there were enough pickets and automobiles to shut down Sahara's mines. Roy Stevers, one of the claimants in this case, testified that when he told John Long, superintendent at one of the mines, that Sahara's employees wanted to go back to work, Long replied that he was afraid the UMW men would come out and tear up the property and cause violence. Long said there wasn't a whole lot he could do.

On March 7, 1978, after the President of the United States invoked the Taft-Hartley Act against the UMW strikers, the UMW pickets were withdrawn, and the PMWA workers returned to their jobs at the four Sahara facilities. During one brief period when pickets reappeared, PMWA members again did not work.

The PMWA contract is separately negotiated from the UMW contract. Many provisions of the two contracts differ, including wage scales and pension plans. Prior to the UMW strike, PMWA workers had received an automatic $2-per-day pay raise provided for by their existing contract so that they were earning $2 per day more than the UMW when the strike commenced. The PMWA contract contained a "most-favored-nation" clause which provided:

> "During the term of this Contract should any competitive field make a contract covering wages or working condi-

tions more favorable to either the Association or the Union signatory hereto, then this Contract shall be modified so that both sides may receive all the benefits of the more favorable contract."

Prior to expiration of the PMWA contract, the PMWA bargained for a $2-per-day increase retroactive to the date of the UMW contract. This was equal to the increase obtained by the UMW as a result of its strike, and meant that the PMWA workers earned $2 per day more than the UMW miners just as they had before the UMW strike. PMWA members testified at the arbitration hearing that they were unaware of the clause and did not know that they would benefit from the UMW strike. The PMWA local president testified that the $2 increase was not an automatic result of the new UMW contract, but was a negotiated concession won by the PMWA.

When the plaintiffs applied for unemployment compensation, Sahara took the position that they were unemployed due to a labor dispute and that they had left work at the Sahara facilities voluntarily and without good cause. The initial claims adjudicator found that plaintiffs were not ineligible for unemployment compensation under section 604, but the Director of Labor reversed this decision.

Section 604 provides:

"Labor dispute. An individual shall be ineligible for benefits for any week with respect to which it is found that his total or partial unemployment is *due to a stoppage of work which exists because of a labor dispute at the factory, establishment, or other premises at which he is or was last employed.* *** This Section shall not apply if it is shown that (A) the individual is not participating in or financing or directly interested in the labor dispute which caused the stoppage of work and (B) he does not belong to a grade or class of workers of which immediately before the commencement of the stoppage there were members employed at the premises at which the stoppage occurs, any of whom are participating in or financing or directly interested in the dispute; provided, that a lockout

by the employer or an individual's failure to cross a picket line at such factory, establishment, or other premises shall not, in itself, be deemed to be participation by him in the labor dispute. (Emphasis added.) Ill. Rev. Stat. 1977, ch. 48, par. 434.

The basic issue in this case is whether there was a labor dispute at the Sahara facilities. Section 604 declares that individuals are ineligible for unemployment compensation only when there is a work stoppage due to a labor dispute at the appropriate factory, establishment, or other premises. Even though there may be a work stoppage, section 604 ineligibility does not apply unless there is also a labor dispute. The Department of Labor contends that the plaintiffs were also ineligible because they had a direct interest in the UMW labor dispute. The Director of Labor and the appellate court based their conclusions on the most-favored-nation clause in the PMWA contract; they viewed it as creating a direct interest because they construed it to mean that PMWA members had a legally enforceable right to receive the same benefits as the UMW. However, inasmuch as we conclude that no labor dispute existed at Sahara, we need not consider whether the plaintiffs were disqualified by a direct interest in a labor dispute or whether they failed to satisfy any of the other conditions which make section 604 inapplicable. Even if the favored-nation clause was the reason the plaintiffs received their $2-per-day increase after the UMW settlement was reached, this does not make them ineligible for benefits so long as there was no labor dispute at the Sahara mines.

Section 604 distinguishes between a work stoppage and a labor dispute. (*Local No. 658, Boot & Shoe Workers Union v. Brown Shoe Co.* (1949), 403 Ill. 484, 490.) That there was a work stoppage at the premises where the plaintiffs were employed, and that their unemployment was caused by that work stoppage, is clear. But section 604 does not permit us to stop there. It also requires a determination of whether the work stoppage was in turn caused by a labor

dispute at the premises. It is essential to note that, in enacting section 604, the legislature directed that ineligibility under this section is triggered only in instances where there is both a work stoppage and a labor dispute; in addition, the situs of the labor dispute must be the factory, establishment, or other premises at which the claimants are employed. We conclude that neither of these requirements is satisfied by the evidence presented in this case.

The evidence fails to show the existence of a labor dispute at any of the four Sahara premises involved here. The only labor dispute was between the UMW and the BCOA. Both the district president of the PMWA and the Sahara vice-president testified that their respective organizations had no dispute with each other. How is it possible to have a dispute without disputants? Since neither of the disputants was located at a Sahara mine or facility, we do not see how a finding that a dispute was taking place between Sahara and its employees could be supported.

The Director of Labor found that the UMW picketing resulted in a total stoppage of work at Sahara, and thereby made Sahara a party to the labor dispute. In essence, this finding means that the labor dispute between the UMW and the BCOA was simultaneously located at the BCOA sites and at the Sahara sites as well. But the Director's reasoning is faulty for it completely eliminates any distinction between work stoppages and labor disputes. The labor dispute involved in this case concerned only the UMW and the BCOA; thus, by refusing to cross the UMW picket lines, the PMWA members created a work stoppage, but not a labor dispute, at the Sahara sites or at any sites operated by the CPAI.

The policies behind the unemployment compensation statutes mandate this result. The purpose of unemployment compensation is to provide income to those who are involuntarily unemployed. (*Shell Oil Co. v. Cummins* (1955), 7 Ill. 2d 329.) While section 604 is designed to pre-

vent payments to those who leave work voluntarily, the provision is crafted to preserve the State's neutrality in labor disputes, *i.e.* to avoid financing one party to the dispute. (*Local 7—641, Oil, Chemical & Atomic Workers International Union v. Department of Labor* (1983), 96 Ill. 2d 94, 98-99; *General Motors Corp. v. Bowling* (1981), 85 Ill. 2d 539, 546-47.) The conditions contained within section 604 which render the section inapplicable are intended to avoid penalizing the innocent victims of labor disputes who are involuntarily unemployed. *Outboard, Marine & Manufacturing Co. v. Gordon* (1949), 403 Ill. 523, 534-35.

An amendment to section 604 enacted in 1975 and providing that failure to cross a picket line is not, in itself, participation in a labor dispute overturned previous decisions of this court holding persons who refused to cross picket lines ineligible for unemployment compensation. (See *Local 7—641, Oil, Chemical & Atomic Workers International Union v. Department of Labor* (1983), 96 Ill. 2d 94, 100; *Owens-Illinois, Inc. v. Bowling* (1983), 95 Ill. 2d 397, 401.) If State neutrality is not affected when workers honor another union's picket line even when there is a labor dispute at their own work premises, then *a fortiori* neutrality is not affected when workers fail to cross a picket line relating to a labor dispute located entirely at other premises. Sahara's workers stayed away from work because of the threat of violence if they crossed the picket line. A claimant need not experience actual bodily harm before he can refuse to cross a picket line; a reasonable fear of either actual or potential violence is sufficient. (*Shell Oil Co. v. Cummins* (1955), 7 Ill. 2d 329, 338-39.) The PMWA members here were innocent victims of a labor dispute at mines operated by BCOA members which did not even involve them.

This result is consistent with our cases. Sahara, and the Director of Labor, stress the broad definition of labor dispute found in *Local 7—641, Oil, Chemical & Atomic Work-*

*ers International Union v. Department of Labor* (1983), 96
Ill. 2d 94, 98, and in *Local Union No. 11 v. Gordon* (1947),
396 Ill. 293, 299, but that is beside the point. No party to
this case disputes the fact that there was a labor dispute.
The only questions which concern us here are where that
dispute was located and who it involved.

In *Local Union No. 11 v. Gordon* (1947), 396 Ill. 293,
299, this court defined a labor dispute as "any controversy
concerning wages, hours, working conditions or terms of
employment." By this definition, there was no labor dis-
pute at the Sahara facilities since there was no controversy
regarding any of these issues at Sahara. The Director of
Labor relies heavily on *American Brake Shoe Co. v. An-
nunzio* (1950), 405 Ill. 44, in which employees at one divi-
sion of a company refused to cross a picket line established
by members of a different union who were employed at an-
other of the employer's divisions. Although this court held
that there was a labor dispute in *American Brake Shoe*,
that case is not controlling here. In *American Brake Shoe*
at least one of of the disputants, the employer, was located
at the picketed site.

The Director of Labor insists that if we do not find a
labor dispute at Sahara on the facts of this case, the court
will be imposing on the statute a requirement that dispu-
tants must be related as employer and employee. We do
not agree that we would be rewriting the statute. It re-
quires that there be a dispute at the site, and we construe
this to mean that at least one of the disputants must be
located at the site. In *American Brake Shoe*, this court
held that, by honoring the picket line, the absent employ-
ees were either participating in the labor dispute or volun-
tarily remaining absent from work. (405 Ill. 2d 44, 50.)
But, it was in response to *American Brake Shoe* and to
similar cases (*Sangamo Electric Co. v. Donnelly* (1962), 26
Ill. 2d 348; *Local Union No. 11 v. Gordon* (1947), 396 Ill.
293) that the Illinois legislature in 1975 amended section

604 to provide that failure to cross a picket line could not, in itself, be considered as participating in a labor dispute. (*Local 7—641 v. Department of Labor* (1983), 96 Ill. 2d 94, 100.) The Director of Labor attempts to sidestep the legislature here and to accomplish in the name of "labor dispute" what he cannot do in the name of "participating." While acknowledging that these employees are not participating in the dispute, the Director seeks to treat their failure to cross the picket lines as moving the site of the dispute to the Sahara facilities. This view is not viable, for it contradicts the legislative purpose of including those who are innocent victims of labor disputes among those who are considered involuntarily unemployed.

The Director and Sahara contend on appeal that even if the plaintiffs are not ineligible under section 604, that section requires that a separate hearing must still be held to determine whether they are eligible to receive benefits for each week under section 500(C) of the Act (Ill. Rev. Stat. 1977, ch. 48, par. 420(C); see *Owens-Illinois, Inc. v. Bowling* (1983), 95 Ill. 2d 397, 403.) The relevant portion of section 500 provides:

> "An unemployed individual shall be eligible to receive benefits with respect to any week only if the Director finds that:
>
>         * * *
>
> C. He is able to work, and is available for work; provided that during the period in question he was actively seeking work." Ill. Rev. Stat. 1977, ch. 48, par. 420(C).

There was only one hearing in this case. However, the initial claims adjudicator's report which declared that the PMWA employees were not ineligible under section 604 did not indicate they were ineligible under any other section. Sahara did not appeal this finding to the Director of Labor or to the courts. *Owens-Illinois* having been decided five years after the UMW strike was settled, the claims adjudicator and the representative of the Department of Labor

could not have had notice of the additional procedures which would be required by this court in that case. Since the record already contains a finding as to both of Sahara's charges, section 604 ineligibility and voluntarily leaving employment without good cause, we consider that it was not the legislative intent to require remandment for further hearings regarding eligibility in circumstances such as those here.

Since the evidence fails to establish that a labor dispute occurred at Sahara, we reverse the decision of the appellate court that the plaintiffs are ineligible for unemployment compensation under section 604.

*Appellate court reversed,*
*circuit court affirmed.*