(No. 30634.— <span style="background:black"></span>)

LOCAL No. 658, BOOT AND SHOE WORKERS UNION *et al.*, Appellees, *vs.* BROWN SHOE COMPANY *et al.*—(BROWN SHOE COMPANY, Appellant.)

*Opinion filed May 19, 1949—Rehearing denied September 19, 1949.*

BAKER, LESEMANN, KAGY & WAGNER, of East St. Louis, for appellant.

D. W. JOHNSTON, of Taylorville, and C. C. DREMAN, of Belleville, for appellees:

Mr. JUSTICE GUNN delivered the opinion of the court:

Appellee, a local union of the Boot and Shoe Workers Union, filed application for unemployment compensation with the Director of Labor on behalf of certain of its members who were employees of appellant, the Brown Shoe Company, a corporation. The capacity of the union as agent, to prosecute the claim, is not objected to by appellant. The loss of time for which compensation was claimed was from February 26, 1946, to March 1, 1946, both dates inclusive.

The claims deputy of the Illinois Department of Labor, who made the initial investigation, found that the stoppage of work on the part of the "production and maintenance" workers, who were the workmen whose claims are here involved, was the result of a labor dispute, and that the unemployment was "due to" the work stoppage. He likewise concluded that the persons whose claims are here disputed, *viz.,* production and maintenance workers at appellant's factory, were ineligible for benefits under section 7(d) of the Illinois Unemployment Act. Ill. Rev. Stat. 1947, chap. 48, sec. 223.

The Director's representative on appeal then conducted a hearing at which both sides presented evidence. The evidence showed that appellant employed about 500 workmen at its Litchfield plant, of whom some 450 were production and maintenance employees. The manufacturing process was divided into nine departments where separate operations were performed in an assembly-line type of operation to produce the finished, manufactured shoes. Local 658 of the Boot and Shoe Workers Union had a contract with the company on behalf of the production and maintenance workers, all of whom were members of the union. All production and maintenance workers had previously been defined by the National Labor Relations Board as a unit appropriate for bargaining and were represented in that process by the union, their exclusive agent for that purpose.

Differences between the company and the union had arisen in January, 1946, over the question of repairing or correcting imperfectly manufactured parts of shoes and the pay for this work. It had previously been done by designated individuals in the department in which the defective operation had occurred. The company wanted each individual in a department to repair his own defective work. An increased rate of pay for this was proposed for a 30- to 90-day trial period, after which it was to be the subject of revision by negotiation. On the day this plan was instituted by the company, with the consent of the union, eighteen workers in the lasting department walked off the job when appointed by the employer as a "team" to perform the work in their department under the new plan. The resulting bottleneck, or gap, in the production line made it necessary for the rest of the line to come to a halt as soon as it was cleared of shoes in various stages of completion. All other production and maintenance workers, including twenty-seven employees in the lasting department, other than the eighteen designated to work on the

faulty shoes, remained at work. The evidence shows that the union may have been actively urging the eighteen workers in the lasting department to stay on the job, and to return to working pending further negotiations, after they had stopped work. It was found as a fact that the union had not authorized the eighteen men to walk off of the job.

Nevertheless, the work stoppage which was appreciable on February 26, became complete on March 1, with the continued absence of the workers in the one department. All workers, including the 18 lasters, returned to work on March 4, 1946. In his opinion, the Director's representative, who heard the evidence, says: "The work stoppage at this period of time was complete. That this pattern of events contains all of the essential ingredients of a labor dispute such as are required by any definition devised to date can hardly be challenged." The evidence shows that the company had orders, materials, and the ability to continue operations. The cessation of work was brought about from no other causes than the events above detailed.

The Director of Labor followed the recommendation of his representative who had heard evidence, and ordered that the claims be disallowed, incorporating in his written decision by reference, the report and opinion of his representative. An appeal was taken to the circuit court of Montgomery county, and the Director's decision was reviewed upon the record as it stood before appeal to the circuit court. The decision of the Director was there reversed, and the case is here on appeal from the circuit court's judgment.

The claims deputy found that the union was the sole representative in collective bargaining, and was recognized by the company as such, for all production and maintenance workers. He found that supervisory employees, foremen, engineers, office workers, and clerical help were excluded from membership in the union and were not represented by

that organization. All of these latter were found to be relieved of ineligibility. The deputy stated, although he did not specifically include it in his separately labeled findings of fact, that all production and maintenance workers were of the same class as the eighteen lasters who withdrew their services in an effort to exert economic pressure and thus favorably resolve a labor dispute. This was his basis for concluding that the second part of the proviso was not met; that production workers were not relieved of ineligibility.

The Director adopted the written opinion and decision of his representative and found that there was a labor dispute, that the stoppage of work resulted from the labor dispute, and that all production workers were both "directly interested in the labor dispute which caused the stoppage of work," and "belonged to a grade or class of workers of which immediately before the commencement of the stoppage, there were members employed at the Company's factory, some of whom were participating in and directly interested in said labor dispute."

Section 7(d) of the Illinois Unemployment Compensation Act, (Ill. Rev. Stat. 1947, chap. 48, par. 223,) provides that an individual shall be ineligible for benefits for any week with respect to which it is found that his total or partial unemployment is due to a stoppage of work which exists because of a labor dispute "provided, that this subsection shall not apply if it is shown that (1) He is not participating in or financing or directly interested in the labor dispute which caused the stoppage of work and (2) He does not belong to a grade or class of workers of which *immediately before the commencement of the stoppage,* there were members employed at the premises at which the stoppage occurs, any of whom are participating in or financing or directly interested in the dispute; * * *." It becomes necessary, then, to determine whether either of the two requirements of the proviso which prevented in-

eligibility imposed by subsection (d) of section 7 was established.

It should be noted that the words "directly interested" in the first part of the proviso relate to the labor dispute, not to the stoppage of work caused thereby. The labor dispute here originated in the proposed plant-wide change in re-working defectively manufactured parts of shoes. The employer was negotiating this controversy with a representative committee of the union about which appellees in their brief say, "All of these employees were represented by a single bargaining agent, namely, Local No. 658, Boot and Shoe Workers Union, in all of their collective bargaining with the Company."

Rates of pay in every department, under the changed conditions of work finally instituted by agreement between the parties so negotiating, were to be affected. The successive steps, one caused or brought about solely by the other, were, then, the institution of the new plan by agreement following a dispute thereon, the unauthorized stoppage of work by a portion of the union members in one department, and the subsequent total stoppage of work in the entire plant as a direct consequence of the said unauthorized cessation of work, all of which trace directly back, one through the other, to the initial dispute.

A labor dispute within the meaning of section 7(d) of the Unemployment Compensation Act is any controversy concerning wages, hours, working conditions or terms of the employment. (*Bankston Creek Collieries, Inc.* v. *Gordon*, 399 Ill. 291; *Fash* v. *Gordon*, 398 Ill. 210.) The same decisions point out the reasons why the merits of the dispute or the reasonableness or unreasonableness of the respective demands of the disputants are not considered in the determination of the question of whether or not a labor dispute exists.

The employer in the instant case could not negotiate directly with the eighteen lasters. Their agency for that

purpose was the same agency which represented all other production workers. The dispute was indivisible; it was one single controversy.

In the present case it seems that in the first part of the proviso of section 7(d) the words "participating in," "financing," and "directly interested in" have a different meaning, one from the other, and that the third expression is not superfluous as being included within the first. Each of these expressions, as is pointed out above, refers not to the stoppage of work but to the labor dispute which causes the stoppage of work. Appellees argue, however, that all of the production workers, except the eighteen, by continuing work until the plant was forced to shut down, had then no dispute of any kind or character with their employer. This argument obscures or overlooks the distinction between labor dispute and resultant stoppage of work. All the production workers on the one hand initially had a dispute with their employer and were engaged in the settlement thereof through their representative. A labor dispute remains such until finally settled. The plan agreed to was acceptable to the union, it may be presumed, because the wages thereby changed were to be the subject of renegotiation after a trial period. The degree of acceptability of this plan to the individual union members, which might vary all the way from wholehearted acceptance to intense opposition to the plan, is of no moment in determining whether a work stoppage by a part of the union production workers immediately thereafter threw out of work all of the present claimants; the question is, did the ultimate stoppage trace back to the dispute as a matter of effect and cause. When thus analyzed, all the facts show that it did. If all production workers were interested directly in the dispute initially, the character of their interest remained direct until the dispute ceased to be a dispute.

The bargaining agent of the union is given power to negotiate with the employer for the benefit of every em-

ployee, and to use the economic pressure of the entire group in obtaining satisfactory settlements of labor disputes. Were it otherwise the bargaining agent of a union could subordinate the interests of the whole collective group to those of a part thereof. The proof that appellees had a direct interest in the labor dispute in this case lies in the fact that the employer is subjected to the joint economic pressure of the whole group without power to negotiate with the dissatisfied few, although they constituted an essential link in a continuous joint operation of all of the employees. When a labor dispute, which concerns a part or all employees, causes, as a direct result, a stoppage of work, it is one in which, under section 7(d), every employee thereby put out of employment is directly interested.

The statute (Ill. Rev. Stat. 1947, chap. 48, par. 230,) provides for a review of the final decision of the Director of Labor, in accordance with the provisions of the Administrative Review Act. (Ill. Rev. Stat. 1947, chap. 110, pars. 264 to 279, incl.) Section 11 of this statute provides: "The findings and conclusions of the administrative agency on questions of fact shall be held to be prima facie true and correct." This statutory provision makes the decision of the Director of Labor binding upon us unless manifestly against the weight of the evidence. Similar provisions of other statutes for the review of decisions of administrative bodies have been so construed. *Caterpillar Co.* v. *Industrial Com.* 397 Ill. 474; *Immaculate Conception Church* v. *Industrial Com.* 395 Ill. 615; *Lawrence* v. *Industrial Com.* 391 Ill. 80.

Accordingly, there is support in the record for the findings of the Director with respect to the application to this case of the first proviso. The record discloses that there was a labor dispute, that the work stoppage of a portion of the employees, even though not authorized by the union representing all, resulted directly therefrom; that the sole effective cause of the subsequent unemployment of the re-

maining production workers was the shut-down of the plant required by the absence of the eighteen who had walked off the job; that there was not departmental bargaining or individual bargaining, but plant-wide bargaining on the dispute, in which every production worker was a member of, and represented by, the same union.

It is unnecessary to discuss at length whether the Director was right in finding that the second part of the proviso likewise rendered claimant ineligible for benefits. Both must be satisfied to prevent the ineligibility from applying.

It is to be noted that section 7(d) provides that an individual shall be ineligible for benefits for any week with respect to which it is found his unemployment is due to a stoppage of work which exists because of a labor dispute. This part of the statute has been held to render such employees automatically ineligible for benefits under the act. (*Local Union No. 11* v. *Gordon*, 396 Ill. 293; *Walgreen Co.* v. *Murphy*, 386 Ill. 32; *Caterpillar Tractor Co.* v. *Durkin*, 380 Ill. 11.) The exceptions to this general provision of ineligibility under section 7(d) are set out above in the conjunctive, in this case being: (1) not directly interested in the labor dispute; (2) not belonging to the same class or grade of workers. Both of these conditions must appear to relieve ineligibility. One alone is not sufficient.

We have given a similar construction to section 2(f) (5)(A)(B)(C) of the same act. (*Toplis and Harding, Inc.* v. *Murphy*, 384 Ill. 463; *Miller, Inc.* v. *Murphy*, 379 Ill. 524.) In addition to the requirements of the the statute that both of these conditions exist, the fact that all of the employees of appellant seeking benefits have by their own act placed themselves in the class of "production and maintenance" workers by being members of the same union, and by jointly making said union their bargaining agent, excludes a division of classes smaller than that. They were also jointly engaged in a continuous and co-ordinated

process for the production of one finished product. It is further to be observed that out of the lasting department twenty-seven remained at work and did not walk out with the dissatisfied eighteen who did. The statute certainly does not contemplate that each person who does a small part in manufacturing a production line product is in a different grade or class. However, the findings of the Director that the evidence in the record is sufficient to show that both grounds necessary to relieve appellees of ineligibility are absent, is *prima facie* correct, and not against the manifest weight of the evidence.

Accordingly, the judgment of the circuit court is reversed, and the order of the Director denying the claims is left in effect.

*Judgment reversed.*