(No. 31250.

BROWN SHOE COMPANY, Appellant, *vs.* ROBERT L. GORDON, Director of Labor, *et al.*, Appellees.

*Opinion filed March 22, 1950.*

BAKER, LESEMANN, KAGY & WAGNER, of East St. Louis, for appellant.

IVAN A. ELLIOTT, Attorney General, of Springfield, (WILLIAM C. WINES, RAYMOND S. SARNOW, JAMES C. MURRAY, and A. ZOLA GROVES, all of Chicago, of counsel,) for appellee Director of Labor; M. J. HANAGAN, of West Frankfort, for other appellees.

Mr. JUSTICE CRAMPTON delivered the opinion of the court:

The Brown Shoe Company appeals from a judgment of the circuit court of Jackson County affirming a decision of the Director of Labor that certain employees of appellant company are eligible for unemployment compensation. The question is whether the finding of the Director of Labor, that the unemployment was not due to a stoppage of work existing because of a labor dispute, is contrary to the manifest weight of the evidence.

Because of the nature of the question involved, it is necessary to relate in some detail the facts disclosed by the record. The appellant company is engaged in the manufacture of shoes. It maintains a plant at Murphysboro, Illinois, where all operations necessary in making shoes are carried on under a continuous production line method. Among those inter-related operations is one known as bedlasting, whereby the worker receives partially completed shoes on racks containing 36 pairs, places each shoe first in a steamer and then on a bedlasting machine, where cement is applied around the edge of the toe and pressure is exerted forming the toe and gluing it to the insole. The operation consumes about a minute per pair. After finishing the second shoe of each pair, the worker is expected to compare it with the other for the purpose of seeing that the toes are properly mated. This checking of the toes normally takes about one second per pair. If the toes are

not similar as to length and width one of the shoes must be returned to the machine and changed to conform with the other. The bedlasters, thirteen in number, are paid on a piece-rate basis.

The operation of bedlasting, as described in the company's piece price book, requires that the "Job must be done so as to mate tips or open toes as the case may be." This description has been in existence for a number of years. Prior to 1942 the bedlasters had been receiving an arbitrary allowance for 84 pairs of shoes per day, as compensation for mating and straightening the tips of shoes. In that year, pursuant to arbitration, this allowance was eliminated and a rate was fixed which would net the bedlasters $7.95 per day. Thereafter, and subsequent to a number of slowdowns and work stoppages, the company reinstated this straight allowance, and the practice was continued until 1945. In that year an arbitration decision was rendered after proceedings in which the bedlasters had asked an increase in pay and the company had sought elimination of the arbitrary allowance. The arbitrator found that the straight allowance should be discontinued, and granted an increase in the piece rate to compensate for its removal. A rate was then set for performing the complete operation, including the mating of toes and the handling of any shoes returned to the bedlasters from the inspecting line for correction of mistakes. This rate, except as to general plant-wide percentage increases, has since remained in effect. In 1946 the bedlasters, through the union, again presented a grievance and made application for arbitration in an attempt to restore the guaranteed allowance for 84 pairs of shoes per day. This was denied, the arbitrator finding that the previous arbitrator's award "seems to have been fair and equitable."

Between October, 1946, and June, 1947, production in the bedlasting department became unsatisfactory, and a large number of shoes had to be returned by the inspectors

because of mismated tips and toe openings. During this period the bedlasters did not check or compare the toes of each pair, as specified in their job description, but simply returned each shoe to the rack after completing the other parts of the operation. On June 27, 1947, the company issued written instructions to them, through the local union, stating that "The Bed Lasters will be expected to mate their toes as they do their work hereafter." The instructions were to become effective July 28, 1947. On that day the production of the bedlasting crew dropped from a daily normal of 8 to 9 cases of shoes per man to a straight daily output of 5 cases per man, with the exception of one worker who was a new member on the bedlasting line, and the hourly production for experienced bedlasters dropped about 50 per cent.

The following day the foreman told the workers that he realized they were deliberately slowing down production and that he expected them to do more work, to which they replied that they were doing all they could. The decreased production continued throughout the week, and on the following Monday the bedlasters and officers of their union demanded that they be paid up to their old normal earnings rate. This request was denied by the company, and during the next two weeks production continued at the low rate despite further conferences by the company with the bedlasters and their union. On August 18, the company sent to its employees and published in a local newspaper an open letter relating the history of the dispute and stating, *inter alia,* that for three weeks the bedlasters had been deliberately restricting their production and had forced the company to drastically cut the working hours of other employees, causing them a 50 per cent loss of wages. Three days later several bedlasters and union officials appeared in the office of the company superintendent for the purpose of a meeting, and at that time one of the workers stated that the bedlasters "intended to play ball and get the pro-

duction." Immediately thereafter some increase in the rate of production occurred, which continued throughout the two-week period ending September 6. The average production rate during that period was about 31 pairs per hour, whereas that for the period from July 28 to August 21 was about 23 pairs per hour. The rate prior to July 28, however, had averaged from 40 to 46 pairs per hour.

On August 28 the company received a demand for an increase in the piece rate. The company denied this the next day by a written reply in which it stated that the denial could be considered as the company's final answer to the grievance and the union could, therefore, proceed to an arbitration of the issue if it so desired. No arbitration was demanded by the union. On September 3 each bedlaster was called to the office, instructed as to his past production rate, told that the company knew he had been slowing down, and informed that unless he resumed his normal rate, or one reasonably close thereto, on the following day he would be discharged. On September 4 none of them produced as much as he had produced prior to July 28, and on the following day ten of the thirteen bedlasters were discharged. Of the three who were not dismissed one was a new man who had not had an opportunity to increase production to a normal level, and the other two were ill and unable to perform normal work. Most of the men who thereafter replaced the discharged bedlasters were employees from other departments in the factory and were inexperienced on the bedlasting job. Three of the replacements were employed from outside the factory, and had had previous experience at bedlasting. Within three or four weeks the factory was back on normal production schedule.

The ten discharged bedlasters filed grievances and an arbitration was held pursuant to the provisions of the labor contract between the company and the union. On February 20, 1948, the arbitrator rendered his decision reinstating

the employees to the jobs but providing that they receive no pay for any time lost by reason of their discharges and that they be placed on probation for a period of six months, during which period "they shall maintain full production as Bed Lasters and in the event any of said employees shall in any manner not maintain a fair and reasonable production rate, the company may, in its discretion, take such action as it may deem fit and proper." Subsequent to this decision nine of the ten bedlasters returned to work. During the first week after their return and during each week thereafter the bedlasters produced substantially more than they did prior to their discharges, and variations again appeared in the hourly production rates of the individual workers.

During the period from July 28 to September 5 the company suffered approximately 50 per cent curtailment in production, as a result of which working hours throughout the rest of the plant were reduced and other production and maintenance employees were rendered partially unemployed. These other employees claim compensation for their partial unemployment from July 28 to September 5, 1947, and the bedlasters claim compensation for their total unemployment subsequent to September 5, 1947, the date of their discharge.

Section 7 of the Unemployment Compensation Act (Ill. Rev. Stat. 1947, chap. 48, par. 223,) provides in part that "An individual shall be ineligible for benefits * * * (d) For any week with respect to which it is found that his total or partial unemployment is due to a stoppage of work which exists because of a labor dispute at the factory, establishment, or other premises at which he is or was last employed." The issue here presented is whether the cause of unemployment was the labor dispute between the company and the bedlasters. The determination of that issue depends upon whether the decreased production in the bed-lasting department was attributable to an added duty of

checking the toes of shoes, or was due to a concerted slow-down by the bedlasters to pressure the company into acceding to their demands for an increased piece rate.

The evidence on the company's behalf, consisting of the testimony of its superintendent and foreman, and of documentary evidence, including records of the individual hourly production of bedlasters taken from its payroll records, is too extensive to set forth in detail. The superintendent testified, *inter alia*, that from his observations he was of the opinion that the ten bedlasters were deliberately slowing down production between July 28 and September 5. The foreman of the bedlasting department testified that prior to becoming a foreman he was a bedlaster for 14 years; that it takes about a minute to last a pair of shoes and about a second to mate their toes; that the bedlasters were not doing all they could do and in his opinion slowed down their production from July 28 to September 5; that prior to July 28, there were variations among the bedlasters in the number of shoes turned out, some employees working considerably faster than others; that after July 28, the rates of production were equal; that after September 5, when new men had been established in the department, individual variations again appeared; and that variations also occurred after the discharged bedlasters had returned to work.

The claimants' witness testified that he had done bed-lasting work for sixteen years; that he never timed himself and would have no idea as to the time required to mate a pair of shoes, but "there is considerable amount of time spent, because you'd have to look at every pair of shoes, compared to the small amount of pairs that you looked at that was sent back to you;" and that from July 28 to September 5 he was doing all he could in the way of delivering work and, as to the other bedlasters, "I believe they was doing all they could do." He further testified on cross-examination that the number of shoes returned from

the inspector for correction of mistakes was considerably reduced after the bedlasters started checking the toes of each pair; and that after his return to work following the period of unemployment he produced as high as eight cases of shoes per day. It is not disputed that at all times shoes returned from the inspector for correction of mistakes had to be re-worked without additional compensation.

Appellant contends the Director's finding that the drop in production in the bedlasting department resulted not from the labor dispute but from the necessity for checking the toes of the shoes, is not warranted by the evidence. We agree. The fact that the bedlasters were engaged in a deliberate slow-down or work restriction is clearly established, not only by the direct testimony of the plant superintendent and the foreman of the bedlasting department but also by the impersonal records of individual production. These records show that both prior to July 28 and after their return to work there were marked variations as to production among the several bedlasters, but that during the period in dispute the production rates were much more uniform. A decrease in production caused by additional duties could not have any substantial effect upon this variance in individual abilities among the workers. Moreover, it is not disputed that the operation of bedlasting takes at least a minute per pair. Yet, according to the only testimony offered as to the specific time required to look at the toes of a pair of shoes and check them, that act takes only one second. This small proportion of the time element could hardly account for a decrease in production of almost 50 per cent. In addition, the arbitrator, selected pursuant to the working agreement which provided that any employee discharged without proper cause shall be reinstated with full pay for all time lost as a result of the discharge, found the employees not entitled to pay for this period, and reinstated them only on condition that they maintain full production thereafter.

To maintain their position, claimants produced only the one witness referred to above. None of the other nine bedlasters was called to testify as to his own conduct during this period. Appellees concede that a labor dispute between the company and the bedlasters existed during the entire time. Yet the only evidence produced to show that the work decrease was due to the checking requirement rather than the labor dispute is the somewhat indefinite testimony of this bedlaster, unsupported by that of other bedlasters who presumably were available. In the face of appellant's evidence, and in the light of the long history of the dispute about wage rates in the bedlasting department, this evidence is insufficient to support the Director's decision.

We are aware of the rule, repeatedly set forth in appellees' briefs, that administrative decisions must be upheld by the courts unless manifestly against the weight of the evidence. This rule does not mean, however, that a stamp of approval must be placed on the decision of an administrative agency merely because such agency heard the witnesses and made the requisite findings. *Drezner* v. *Civil Service Com.* 398 Ill. 219, 231.) It is the duty of the court to review the proceedings and, if the findings are against the manifest weight of the evidence, to set aside the decision. We have carefully considered the record in this cause and conclude that, on the entire evidence, the only finding in accord with its manifest weight is that the bedlasters engaged in a concerted slowdown during the period preceding their discharges, as a means of enforcing their demands for a pay increase.

It is well settled that where employees engage in slowdown practices, by which they reduce the amount of work done in an effort to compel their employer to grant some benefit, and are discharged as a result, their unemployment is due to a labor dispute within the meaning of the act and they are ineligible for compensation. (*Bankston Creek*

*Collieries* v. *Gordon,* 399 Ill. 291.) The law is equally clear that the merit or justification of the position taken by either of the contesting parties has no place in the determination of the question whether a labor dispute exists rendering the unemployment noncompensable. The essential elements are the labor dispute and the resulting stoppage of work. (*Fash* v. *Gordon,* 398 Ill. 210.) We think the evidence in the case at bar clearly shows that the unemployment of the bedlasters resulted from a labor dispute, and the Director's finding to the contrary cannot be sustained on any reasonable interpretation of that evidence.

The question remains whether the partial unemployment of the other production and maintenance employees during the period from July 28 to September 5, 1947, is likewise within the exclusion of subsection 7(d). It is not disputed that this partial unemployment was due to the decrease of production in the bedlasting department. Appellees argue, however, that such employees do not belong to the same grade or class of workers as the bedlasters and are therefore exempt under the proviso to subsection 7(d). The proviso makes the subsection inapplicable to an employee if it is shown that "(1) He is not participating in or financing or directly interested in the labor dispute which caused the stoppage of work and (2) He does not belong to a grade or class of workers of which immediately before the commencement of the stoppage there were members employed at the premises at which the stoppage occurs, any of whom are participating in or financing or directly interested in the dispute." To relieve the employee of ineligibility, both of these conditions, namely (1) that he is not directly interested in the labor dispute and (2) that he does not belong to the same class or grade of workers, must be satisfied. One, alone, is not sufficient. (See *Local 658, Boot and Shoe Workers Union* v. *Brown Shoe Co.* 403 Ill. 484.) We think the second condition is not met by these employees; that they belong in the same grade or class

of workers as the bedlasters; and that they are consequently ineligible for unemployment benefits.

In determining the meaning of the words "grade or class" they must be read with reference to the context in which they appear. Obviously, this meaning includes something more than the group directly interested in the dispute, for otherwise the second condition would be superfluous. We have recently had occasion to consider the scope of those words as applied to employees in another plant of appellant company. In *Local No. 658, Boot and Shoe Workers Union* v. *Brown Shoe Co.* 403 Ill. 484, eighteen workers in the lasting department engaged in a strike because of their dissatisfaction with certain changes made by the company pursuant to a production plan established with consent of the labor union. As a result the production line came to a halt and other production and maintenance workers were rendered idle. The labor union, which represented all the production and maintenance workers, had previously negotiated with the company concerning a dispute affecting rates of pay in every department, and the new production plan was the outgrowth of that dispute. It was held that the stoppage of work by the lasters traced directly back to the initial controversy, in which all the production workers were interested, and that the latter therefore failed to satisfy the first condition of the proviso. Although the holding was based upon a construction of the first condition, we also observed that "the fact that all of the employees of appellant seeking benefits have by their own act placed themselves in the class of 'production and maintenance' workers by being members of the same union, and by jointly making said union their bargaining agent, excludes a division of classes smaller than that. They were also jointly engaged in a continuous and co-ordinated process for the production of one finished product." The same is true of the claimants in the case at bar. All production and maintenance employees, including the bedlasters, have

the same bargaining agent, the officers of which actively participated in the dispute between the bedlasters and the company. There was only one contract between the company and the union, acting on behalf of all such employees. The bedlasters had no separate agreement with the company. Further, the duties of all the claimants related to the same process of manufacture, the operation of bedlasting being merely part of a continuous production line. The conclusion is plain that all the claimants belong to the same grade of workers, within the meaning of the proviso to subsection 7(d).

The facts in *Outboard, Marine & Manufacturing Co. v. Gordon*, 403 Ill. 523, relied upon by appellees, are easily distinguished from those in the present case. There, the claimants were office workers rendered idle because of a strike by the factory workers. In holding them not barred from compensation as being of the same grade or class as the strikers we observed: "The duties of the office workers in the case before us clearly put them in a different grade and a different class from those working in the production and maintenance end of the factory." In the case at bar there is no such difference in the natures of the respective duties. It was also pointed out that another test is whether the union-management agreements were separate or otherwise as to each group of employees. In that case such separate labor agreements did exist. Here there is only one. There the office workers belonged to a different union than the employees engaged in the dispute. Here one union represents all the claimants.

We conclude, therefore, that each of the present claimants is ineligible for unemployment benefits. The judgment of the circuit court is reversed and the cause remanded, with directions to proceed in accordance with the views expressed herein.

*Reversed and remanded, with directions.*