EVA BARTLETT ET AL. *v.* ADMINISTRATOR, UNEMPLOYMENT COMPENSATION ACT, ET AL.

INGLIS, C. J., BALDWIN, WYNNE, DALY and CONWAY, Js.

Argued May 5—decided June 27, 1955

*Samuel Gruber,* for the appellants-appellees (plaintiffs).

*John N. Cole,* with whom was *Beecher N. Clafflin,* for the appellant-appellee (defendant Landers, Frary and Clark).

DALY, J. The plaintiffs, employees of the defendant Landers, Frary and Clark, hereinafter referred to as the employer, made claim for unemployment benefits for the period from March 20, 1953, to April 17, 1953. The unemployment commissioner concluded that their unemployment during that period was due to the existence of a labor dispute at the employer's plant and that they were ineligible for bene-

fits. Upon appeal by the plaintiffs, the Superior Court rendered judgment dismissing the appeal and affirming the commissioner's decision. From that judgment the plaintiffs and the defendant employer have appealed.

The facts found by the unemployment commissioner are as follows: The plaintiffs were members of Local 207, United Electrical, Radio and Machine Workers of America, or were in a unit for which that union was the exclusive bargaining agent. In the employer's plant, they worked in departments in which materials were handled either preceding or following operations by the buffers and polishers. In the buffing department, 115 workers were employed on two shifts, and, in the polishing department, 85 were similarly employed. On March 10, 1953, the employer put into effect new rates on two operations in the buffing department. The union filed grievances against the application of these rates and on March 12 commenced to process its grievances through settlement procedures outlined in the contract between it and the employer. On March 12, 13 and 16, employees in the buffing department walked off their jobs. No reason was given for these walkouts, no one of which lasted more than one day. All employees in the buffing and polishing departments worked March 17, 18 and 19, and those on the first shift worked March 20. On that day, the union was informed that the employer had concluded not to change the rates established March 10. The buffers who reported for work on the second shift on March 20 became aware of this decision, and most of them walked off the job after three and a half hours.

On the next working day, March 23, less than the full complement of buffers reported for work on the first shift, and they walked out after one hour. The

polishers on the first shift left after three hours. In both departments, those on the second shift did not report for work. During the remainder of the week, through March 27, practically all the buffers and about fifty-five of the polishers remained away from work. On Monday, March 30, as the result of the introduction of a new checking system, buffers on the first and second shifts walked out after two hours. Fifty-six polishers, on both shifts, walked off the job that day; thirty-one remained at work. On April 1, the employer sent letters to 101 absent buffers and 53 absent polishers, warning them of the consequences of future work stoppages. These employees, however, remained away from work for the balance of the week, through April 3. Their walkouts were not authorized by the union, which, in fact, tried to induce the employees to return to work. The walkouts were illegal and in violation of the collective bargaining agreement.

On April 6, the polishers and most of the buffers returned to work, but a number of the buffers, on both shifts, walked out after a short time. On April 8, the employer sent a letter of discharge and a termination slip to each of the sixty-eight buffers who had walked out or failed to report for work. The stated reason for discharge was "Violation of union contract—work stoppage." The following day, the union filed a grievance against the discharge of these buffers. On April 16, an agreement was reached between the union and the employer. It provided that any of the discharged buffers who reported for work on or before April 20 would be reinstated. Sixty-three returned to work and were reinstated.

Meantime, because of the connection between the plaintiffs' work and that of the buffers and polishers, groups of the plaintiffs had been laid off as follows:

115 between March 23 and 27, 45 between March 30 and April 3, 13 between April 6 and 11, and 2 between April 13 and 18. The commissioner concluded that there was no labor dispute at the plant between March 17 and the commencement of the second shift on March 20, but that there was a labor dispute between the employer and some of its employees from the time of the second shift on March 20 to April 17. He also concluded that, although the plaintiffs did not participate in or finance the labor dispute and were not directly interested in it, their unemployment was due to the existence of a labor dispute in which members of the trade, class or organization of workers to which they belonged had participated and were directly interested.

The plaintiffs, as appellants, claim that the Superior Court erred in sustaining the commissioner's conclusion that there was a labor dispute in existence between the employer and a group of its employees. They contend that the facts found do not legally support such a conclusion and that it is unreasonable and illogical, as shown by the evidence. They maintain that there was no controversy between the employer and those employed as buffers or polishers.

The Unemployment Compensation Act (General Statutes, c. 374) does not define the words "labor dispute." For the meaning of the term, as it is used in § 7508(3),[1] we must look to the definition contained

---

[1] "Sec. 7508. DISQUALIFICATIONS. An individual shall be ineligible for benefits . . . (3) during any week in which it shall be found by the administrator that his total or partial unemployment is due to the existence of a labor dispute at the factory, establishment or other premises at which he is or has been employed, or at a factory, establishment or other premises operated by his employer in the state of Connecticut, provided the provisions of this subsection shall not apply if it shall be shown to the satisfaction of the administrator that (a) he is not participating in or financing or directly interested in the labor dispute which caused the unemployment, and (b) he does

in the statutes relating to injunctions in labor disputes. *Alvarez* v. *Administrator,* 139 Conn. 327, 333, 93 A.2d 298; *Conte* v. *Egan,* 135 Conn. 367, 371, 64 A.2d 534. The term "labor dispute" includes "any controversy concerning terms or conditions of employment, or concerning the association or representation of persons in negotiating, fixing, maintaining, changing or seeking to arrange terms or conditions of employment or concerning employment relations, or any controversy arising out of the respective interests of employer and employee, regardless of whether or not the disputants stand in the proximate relation of employer and employee." General Statutes § 7408(c).

Clearly, the commissioner could reasonably conclude that a large number of buffers and polishers walked off the job and voluntarily stayed away from work at various times in furtherance of an effort to induce the employer to change the rates established March 10. See *Conte* v. *Egan,* supra, 372. A controversy is a labor dispute if it concerns terms or conditions of employment. The controversy in the present case, involving as it did rates of pay in the buffing department, surely concerned that subject. Moreover, under § 7408(c), a controversy is also a labor dispute if it arises "out of the respective interests of employer and employee." *Alvarez* v. *Administrator,* supra, 334.

---

not belong to a trade, class or organization of workers, members of which, immediately before the commencement of the labor dispute, were employed at the premises at which the labor dispute occurred, or at a factory, establishment or other premises operated by his employer in the state of Connecticut and are participating in or financing or directly interested in the dispute; provided any individual whose unemployment is due to a lockout shall not be disqualified, unless the lockout results from demands of the employees, as distinguished from an effort on the part of the employer to deprive employees of some advantage they already possess. . . ."

The plaintiffs claim that there was no labor dispute in existence since the actions of the buffers and polishers were unauthorized, illegal and in violation of the collective bargaining agreement and since the union was not involved in a labor dispute. There is no provision in our statutes to the effect that a labor dispute cannot exist unless the actions of employees are authorized, legal and in accordance with the collective bargaining agreement. Neither is there any requirement that the union be a party to the dispute. The plaintiffs belonged to a trade, class or organization of workers, members of which had participated in and were directly interested in a labor dispute. The union was the exclusive bargaining agency. The employer could not negotiate independently with either the plaintiffs or the employees who participated in the work stoppages. There was a labor dispute notwithstanding the fact that the actions of the employees who participated in the walkouts were unauthorized, illegal, not in accordance with the collective bargaining agreement and not authorized or approved by the union. *Adams* v. *Review Board,* 121 Ind. App. 273, 279, 98 N.E.2d 681.

The plaintiffs, in claiming that a labor dispute did not exist, rely upon the language in *Kenmike Theatre, Inc.* v. *Moving Picture Operators,* 139 Conn. 95, 97, 90 A.2d 881. In that case, the plaintiff sought an injunction restraining the defendants, a union and its officers, from picketing the plaintiff's premises. None of the employees of the plaintiff were members of any union. There had been no dispute between the plaintiff and its employees concerning hours, wages or conditions of employment. The question was not whether a labor dispute existed but whether the picketing was an attempt to compel the employer to force its

employees to join a union and thereby violate the statute which insures to employees freedom from such interference by their employer. Id., 98; General Statutes § 7391. It is clear that the case furnishes no authority for the plaintiffs' claim that a labor dispute did not exist in the instant case.

The plaintiffs maintain that the Superior Court erred in overruling their claim that, even if a labor dispute did exist, the commissioner's conclusion that the plaintiffs' unemployment was due to the labor dispute was unreasonable and illogical and not legally supported by the subordinate facts. An unemployment commissioner is an administrative officer. Upon an appeal from his decision the Superior Court does not try the matter de novo. It is not its function to adjudicate questions of fact. Nor may it substitute its own conclusions for those of the commissioner. It may go no further than to determine whether the commissioner acted unreasonably, arbitrarily or illegally. *Lanyon* v. *Administrator,* 139 Conn. 20, 28, 89 A.2d 558. The courts are bound by the findings of subordinate facts and the reasonable conclusions of fact made by the commissioner. *Carper* v. *Administrator,* 139 Conn. 515, 520, 95 A.2d 378; *Almada* v. *Administrator,* 137 Conn. 380, 391, 77 A.2d 765. The operations ordinarily performed by the buffers and polishers were obviously materially decreased by the series of work stoppages. As the plaintiffs worked in departments in which materials were handled either preceding or following the operations regularly performed upon them by the buffers or polishers, integrated and progressive production was necessarily hampered. It follows that, since one department was dependent upon another for work, the requirement for the services of the

plaintiffs was substantially diminished by the labor dispute during the period of time in question. The commissioner did not err in concluding that the plaintiffs' unemployment resulted from the labor dispute.

The plaintiffs contend that the court erred in overruling their claim that, if a labor dispute did exist, it ceased after April 8 and that the plaintiffs who were thereafter unemployed are entitled to benefits. They maintain that, since the polishers reported back to work on April 6 and remained at work and since the employer sent letters of discharge on April 8 to the buffers who had walked out or failed to return to work, no labor dispute existed after April 8. The commissioner found that on the following day, April 9, the union filed a grievance against the discharge of the buffers and that on April 16 the parties agreed that the buffers would be reinstated if they reported for work on or before April 20. It is true that the union neither authorized nor approved any of the walkouts. It did, however, act as the representative of the sixty-eight discharged buffers in filing the grievance for them and, as a result of the agreement reached on April 16, sixty-three of them did return to work on or before April 20. Although the mere filing of a grievance does not constitute a labor dispute, the facts found must be examined in determining whether the commissioner was justified in concluding that the dispute continued into and included April 16, the day on which an agreement was reached. It was for the commissioner to determine whether the plaintiffs' claims for benefits were "valid and, if valid, the week with respect to which benefits shall commence, the weekly amount of benefits payable and the maximum pos-

sible duration thereof." General Statutes § 7513. The commissioner's conclusion that the unemployment of the plaintiffs for the period in question was due to the existence of a labor dispute is supported by the finding and therefore must stand. *Conte* v. *Egan,* 135 Conn. 367, 373, 64 A.2d 534.

The remaining question upon the appeal of the plaintiffs is whether they are within the exception contained in § 7508(3) and therefore are entitled to benefits, as they claim. The commissioner found that "their unemployment was due to the existence of a labor dispute and they belonged to a trade, class or organization of workers, members of which had participated in and were directly interested in a labor dispute" and concluded that therefore they were ineligible for benefits. The plaintiffs claim that the buffers and polishers, the employees who were found to have participated in and to have been directly interested in the labor dispute, constituted a separate "trade, class or organization of workers" for the purpose of the walkouts. The plaintiffs admit that they were members of the union to which the buffers and polishers belonged, but they contend that there is nothing in § 7508(3)(b) that compels the conclusion that mere membership in the same union is sufficient to disqualify them, since the union did not authorize or approve the walkouts and made an effort to persuade and induce the employees who participated in the walkouts to return to work. The union, to which the plaintiffs belonged, was the exclusive bargaining agent. It participated in the dispute by processing the grievances with regard to rates and the discharge of buffers. The bargaining unit, the union, constituted a class of workers, members of which had participated in

and were directly interested in the labor dispute. The plaintiffs and the employees who had participated in and were directly interested in the labor dispute belonged to the same bargaining unit. *Adams* v. *Review Board,* 121 Ind. App. 273, 279, 98 N.E.2d 681; *Brown Shoe Co.* v. *Gordon,* 405 Ill. 384, 393, 91 N.E.2d 381; *Johnson* v. *Pratt,* 200 S.C. 315, 346, 20 S.E.2d 865. By the terms of § 7508(3)(b), it is not essential to disqualification for benefits that the trade, class or organization of workers to which the employee belongs be participating in a labor dispute as a unit or organization. It is sufficient that other members of the same trade, class or organization are so participating as individuals. The plaintiffs are not within the exception contained in § 7508(3) and are ineligible for benefits.

The employer made a motion for correction of the commissioner's finding. It complained of the finding that there was no labor dispute between March 17 and the commencement of the second shift on March 20, and of the refusal to find that there was a labor dispute between March 12 and March 17. Its basic contention was that, as work stoppages occurred on March 12, 13 and 16, they must be viewed as part of the labor dispute and as leading to the necessary conclusion that the labor dispute began on March 12 rather than on March 20. The court below, upon consideration of the employer's reasons of appeal complaining of the refusal to correct the finding, found no error in the commissioner's decision.[2] The employer has ap-

---

[2] We note that the judgment file adjudges that "the appeals of both the plaintiffs and the defendant be, and they are hereby, dismissed." The only appeal from the commissioner was by the plaintiffs, and that appeal is the only one which the judgment should have dismissed. The reasons of appeal by the employer did not place it in the position

pealed to this court, assigning error in the overruling of its claim that the commissioner erred in refusing to correct the finding in the particulars noted above. Since the employer was not an appellant in the court below and was the prevailing party on the plaintiffs' appeal, it was not aggrieved by the judgment affirming the decision of the commissioner and had no right of appeal to this court. General Statutes § 8003. The correct procedure for an appellee who seeks, in connection with the other party's appeal to this court, to have the commissioner's finding corrected is to file assignments of error rather than a bill of exceptions or a cross appeal. Practice Book §§ 320, 321; *Drouin* v. *Chelsea Silk Co.*, 122 Conn. 129, 131, 187 A. 904. If the employer's assignments of error are treated in this light, it becomes quickly apparent that they present an academic issue. They seek a correction of the finding in particulars which would have no bearing on the merits of the plaintiffs' appeal. Furthermore, in view of the fact that we have concluded that the plaintiffs are not entitled to benefits, the employer could gain no legitimate advantage from the corrections sought. There is no reason, therefore, to consider these assignments of error.

There is no error on the plaintiffs' appeal; the defendant's appeal is dismissed.

In this opinion the other judges concurred.

---

of appealing. It was merely seeking, as an appellee may, to have the finding corrected. Practice Book §§ 314, 321.