BETHLEHEM STEEL COMPANY *v.* BOARD
OF APPEALS, DEPARTMENT OF EM-
PLOYMENT SECURITY ET AL.

[No. 140, September Term, 1958.]

*Decided February 17, 1959.*

The cause was argued before HENDERSON, HAMMOND, PRESCOTT and HORNEY, JJ., and HENRY, JR., Chief Judge of the First Judicial Circuit, specially assigned.

*Franklin G. Allen,* with whom were *Charles T. Albert* and *Piper & Marbury* on the brief, for appellant.

*Bernard S. Melnicove, Special Assistant Attorney General,* and *J. Robert Brown, General Counsel for Maryland Department of Employment Security,* with whom were *C. Ferdinand Sybert, Attorney General,* and *J. N. Phillips, General Counsel for Board of Appeals, Maryland Department of Employment Security,* on the brief, for appellee, Board of Appeals, Department of Employment Security.

*William J. Yarworth,* with whom were *Yarworth & Link* on the brief, for appellees, Panagiotes Baxivanos *et al.*

HORNEY, J., delivered the opinion of the Court.

This is another case concerning unemployment benefits, in which the claims of unemployed workers are determined only after traveling a long (and often "rocky") legal road with stopovers at the *seat* of the Claims Examiner, Referee, Board of Appeals and the Superior Court of Baltimore City. The issue is now before us to decide whether the lower court was right in affirming the determination of the Board that the claimants were entitled to benefits, notwithstanding the provisions of Code (1957) Art. 95A, § 6 (e). The employer appealed from the decision of the court, contending that the claimants were disqualified because they were members of the same "grade or class" as their fellow employees who participated in a labor dispute.

A portion of the steel produced at the Bethlehem Steel Company (the company) at Sparrows Point is processed into tin plate at the "BJ42″ Mill." In this part of the plant rolls of steel are fabricated into finished tin plate, cut to the sizes required by buyers and packaged for shipment. The work done in this mill is a continuous operation analogous to the work performed in an assembly line. Due to the nature of the operation, if there is a slowdown or work stoppage at any point, it will be reflected in a reduction of the flow of materials to a later stage.

The claimants, twenty-eight in number—one fourth of whom were female employees—were employed in the later stages of this process. Their functions consisted of finishing, shipping and warehousing the tin plate produced in the earlier stages of the process. In two of the earlier stages—the "skin-passing" and "rotary-shearing" sections—the workers were more skilled than the claimants and consequently demanded and received a higher rate of pay.

The workers employed by the company are all members of Local Union 2609 of the United Steel Workers of America (the union). The union is the exclusive bargaining agent for the employees of the company pursuant to a contract entered into in 1956 and which remains in effect until July of 1959.

Despite the terms of the contract, some of the skin-passers

and rotary-shearers became dissatisfied with the incentive pay provisions of the contract. These employees, in addition to an hourly rate, also received incentive bonuses depending on the volume of production. In January of 1957 the union undertook to negotiate with the company in an effort to increase the bonus system rates. Such negotiations later evolved into formal grievance proceedings.

The production figures for the period from mid-February of 1957 to mid-May of 1957 showed a decided decline, which was traced to the employees in the skin-passing and rotary-shearing sections. The Board found as a fact that the reduction occurred because of a deliberate slowdown of production by those employees for the purpose of forcing the company to grant more favorable terms of employment.

The company wrote letters of protest to the union requesting it to exert its influence with the employees since the collective-bargaining contract prohibited the slowdown. The union president denied that the union was involved in the slowdown and attributed the decline in production to other factors, and did not respond to further demands that steps be taken to correct the situation. In a letter of March 7, 1957, the company pointed out to the union that a continuation of the slowdown would result in the reduction of materials moving to subsequent stages in the production line with the consequential result that less work would be available to workers employed in the later stages.

According to the employment contract, if other factors such as ability and physical fitness were equal, employees would be laid off in the inverse order of the length of continuous service. Therefore, when the flow of materials declined and there was less work available in the sections in which the claimants worked, they, being younger and less experienced workers, were laid off first. The lay-offs were caused by the slowing down of the older and more skilled employees in the employment "chain." The claimants had not participated in the slowdown.

None of the claimants was employed in the sections engaged in the slowdown. They were employed in the section which dealt with the final stages of the product produced in the mill.

They were, for the most part, unskilled workers and were paid a fixed hourly rate without any incentive to produce more. Neither they, nor the other employees in their section, were in any manner concerned with the incentive pay issue raised by the more skilled and better paid skin-passers and rotary-shearers, although they were all members of the same union.

The question as to whether the claimants are eligible for unemployment benefits depends on the provisions of § 6 (e), *supra*, which provides that a claimant shall be disqualified for benefits:

> "For any week with respect to which the Executive Director finds that his unemployment is due to a *stoppage of work* which exists because of a labor dispute at the factory, establishment, or other premises at which he is or was last employed, provided that this subsection shall not apply if it is shown to the satisfaction of the Executive Director that—
>
> (1) He is not participating in or financing or directly interested in the labor dispute which caused the stoppage of work; and
>
> (2) He does not belong to a *grade or class* of workers of which, immediately before the commencement of the stoppage, there were members employed at the premises at which the stoppage occurs, any of whom are participating in or financing or directly interested in the dispute; * * *." (Emphasis added).

In employment compensation cases we have consistently held, as is required by § 7 (h) of Article 95A, that the findings of the Board as to the facts are conclusive, if there is any substantial evidence to support such findings. The jurisdiction of the court, in such cases, is specifically limited to questions of law. But, if the facts and the inferences to be drawn therefrom are undisputed, then a construction of the statute as applied to such undisputed facts is a question of law. *Emp. Security Board v. LeCates,* 218 Md. 202, 145 A. 2d 840 (1958), and the cases therein cited.

It is conceded that none of the claimants participated in or

was financing or directly interested in the labor dispute, but since there was a labor dispute, the burden was on each of the claimants to show he did not belong to the grade or class of the workers who engaged in the slowdown. *Mitchell, Inc. v. Md. Emp. Sec. Bd.,* 209 Md. 237, 121 A. 2d 198 (1956). The company concedes the accuracy of the findings of the Board, but the record fails to show the exact duties of the claimants. The Board found that the claimants were employed in those sections or departments which handled the warehousing and shipping of the tin plate produced in the mill. The record shows that the referee had also found that this included the finishing operation. But, because there is no evidence of the specific duties of each claimant, it is presumed that all of the workers in those sections engaged in finishing, warehousing and shipping. Therefore, their rights in this controversy must stand or fall together. Since, as stated above, the facts are virtually undisputed, the question is clearly one of law.

The real question, as we see it, is: Whether these claimants are of the same *grade or class* of workers as those who participated in the labor dispute when they worked in the same line of production on the same material, are in the same collective-bargaining unit, and are represented by the same local union, but are less skilled and trained, and are paid on a different and lower wage scale.

So far as this Court is concerned the question thus presented is novel, although we have previously construed other parts of § 6 (e), *supra.* See *Mitchell, Inc. v. Md. Emp. Sec. Bd., supra,* and *Tucker v. American S. & Ref. Co.,* 189 Md. 250, 55 A. 2d 692 (1947). As was stated in the *Tucker* case, we are not concerned here with any questions between the union and the company as to the fault of the participants in the dispute, but only with the question as to whether the claimants come within the terms of the statute.

The courts in other jurisdictions, having statutes containing similar "labor dispute" clauses, have interpreted the meaning of the term "grade or class." Some courts have looked principally to the claimants' membership in the union involved in the dispute. See *Queener v. Magnet Mills,* 179

Tenn. 416, 167 S. W. 2d 1 (1942). *Copen v. Hix,* 130 W. Va. 343, 43 S. E. 2d 382 (1947). Others rely on the nature of the work performed by the strikers and the claimants, and hold that, if there is a strong similarity between the two groups, the claimants are in the same grade or class. *In re Deep River Timber Co.'s Employees,* 8 Wash. 2d 179, 111 P. 2d 575 (1941): Still other courts have gone so far as to consider all workers in an entire plant or establishment as being in the same grade or class. *Westinghouse Elec. Corp. v. Unemployment Comp. Bd. of Rev.,* 165 Pa. Super. 385, 68 A. 2d 393 (1949). It is next to impossible to rationalize some of the decisions in this field, but, we think it is significant that the cases that have considered the question of workers in a continuous, integrated process, when the performance of subsequent steps in the manufacturing process is dependent on the production of preceding processes, seem to hold that the employees are in the same grade or class.

In *Brown Shoe Co. v. Gordon,* 405 Ill. 384, 91 N. E. 2d 381 (1950), a group of employees in the "bedlasting" section of a shoe factory engaged in a deliberate slowdown in order to gain better piece-rate pay. Due to the fact there was a continuous production line the work in a subsequent stage was reduced. The claimants had no interest in the pay rate of the bedlasters though they were members of the same bargaining unit. The union had not authorized the slowdown. Under a statute substantially the same as ours, the Illinois Supreme Court reversed the determination of the director of labor and the circuit court and held that the claimants were in the same grade or class as the bedlasters. In so holding, the Court stated that the term "grade or class" must have been intended to mean more than just a reference to those directly interested in the dispute since a provision of that type was already in the preceding clause. [See § 6 (e) (1), *supra*]. All of the employees had the *same bargaining agent;* there was only *one contract* between the union and all of the employees; and the bedlasters had no separate agreement with the company. Finally, the duties of all of the claimants related to the *same process* of manufacture, the operation of

bedlasting being merely a part of a *continuous production line.*

The *Brown Shoe* case, *supra,* distinguished the case of *Outboard, Marine & Mfg. Co. v. Gordon,* 403 Ill. 523, 87 N. E. 2d 610 (1949), where the claimants were office workers rendered idle because of a strike by the factory workers. The duties were clearly different, there were separate labor agreements and the workers belonged to different unions. See also *Shell Oil Co. v. Cummins,* 7 Ill. 2d 329, 131 N. E. 2d 64 (1955), where the same Court held that twelve craft unions, which were all members of a trade council, by jointly negotiating with the employer for a single working agreement, did *not* thereby place all of its members in the same grade or class so as to make all employees—in the event of a strike by one of the unions—ineligible for compensation. There, there was no production line at which all of the affected employees worked. The Court also stated that the existence of a single agreement between the company and the employees is but one factor to consider in deciding whether the employees are in the same grade or class.

In *Adams v. Review Board, Etc.,* 121 Ind. App. 273, 98 N. E. 2d 681 (1951), there was a "wildcat" strike of the operators of machinery in a steel mill sparked by a dispute as to the rate of pay. There, there was a continuous, integrated line of work, and the claimants, who were employed in the finishing department, were laid off due to lack of work. The claimants and the strikers were members of the same bargaining unit. The Court held that all were members of the same grade or class and that the claimants were ineligible for benefits. See also *Bartlett v. Administrator, Unemployment Comp. Act,* 142 Conn. 497, 115 A. 2d 671 (1955); *Local No. 658 v. Brown Shoe Co.,* 403 Ill. 484, 87 N. E. 2d 625 (1949); *Unemployment Compensation Commission v. Martin,* 228 N. C. 277, 45 S. E. 2d 385 (1947); *Members of Iron Workers' Union v. Industrial Comm.,* 104 Utah 242, 139 P. 2d 208 (1943); *Johnson v. Pratt,* 200 S. C. 315, 20 S. E. 2d 865 (1942).

Apparently there is little doubt among the law writers that

the use of the term "grade or class" in the statutes was intended to prevent "key-man" work stoppages. See Williams, *The Labor Dispute Disqualification—A Primer and Some Problems,* 8 Vand. L. Rev. 338 (1955). The law writers generally—including Williams, who advocates amendment of the statutes—have voiced their disapproval of the provision. See, for instance, Shadur, *Unemployment Benefits and the "Labor Dispute" Disqualification,* 17 U. Chi. L. Rev. 294 (1950), who states that it "frustrates the very purpose of unemployment compensation." Understandably, the claimants argue that to deny them benefits makes them victims of a labor dispute in which they had no interest. On the other hand, if such argument was accepted by us, it would have the effect of equating the provisions of § 6 (e) (2), *supra,* with those of § 6 (e) (1), *supra,*[1] thereby virtually eliminating § 6 (e) (2) from the statute. See *Brown Shoe Co. v. Gordon, supra.* It may be that the statute should be amended, but whether the strikers, under circumstances similar to those present here, would be acting solely for themselves or would also be acting directly or indirectly for the claimants, is a decision the lawmakers must make. Be that as it may, we think it is clear that the present statutory provision was deliberately aimed at discouraging "key" workers in "key" positions along a continuous production line from effectively tieing up the operations of a whole plant.

In a case such as this where the claimants belonged to the same collective-bargaining unit—where they were bound and protected by the same labor contract with the employer—and where their duties were related to the same manufacturing process which was a part of the same continuous production line—as the workers who deliberately slowed down in an abortive effort to increase their rate of pay, such claimants were in the same *grade or class* as the slowdowners, notwithstanding the fact the claimants were less skilled and trained and were paid on a different and lower wage scale.

---

1. For the "policy" behind § 6 (e) (1) see Lesser, *Labor Disputes and Unemployment Compensation,* 55 Yale L. J. 167 (1945).

For the reasons stated we hold that the decision of the lower court must be reversed.

*Judgment reversed, and case remanded for the entry of a judgment reversing the Board of Appeals, the appellees to pay the costs.*