(No. 31270.—

LOCAL UNION NO. 222, OIL WORKERS INTERNATIONAL UNION, *et al.*, Appellants, *vs.* ROBERT L. GORDON, Director of Labor, *et al.*, Appellees.

*Opinion filed May 18, 1950.*

FRANCIS HEISLER, and JULIUS LUCIUS ECHELES, both of Chicago, for appellants.

IVAN A. ELLIOTT, Attorney General, of Springfield, (WILLIAM C. WINES, RAYMOND S. SARNOW, JAMES C. MURRAY, and A. ZOLA GROVES, all of Chicago, of counsel,) for appellees.

Mr. JUSTICE FULTON delivered the opinion of the court:

Local Union No. 222, Oil Workers International Union, on behalf of its members who are employees of the Texas Company Lockport Works, Lockport, Illinois, have appealed from an order of the circuit court of Cook County, which affirmed the action of the Director of Labor in denying unemployment compensation benefits to said employees for the period from September 19, 1945, to October 6, 1945.

A review of the record discloses that the Texas Company employed approximately 1000 production and maintenance workers at its Lockport works at Lockport, Illinois, during the months of August and September, 1945, all of whom were represented by the union, the Texas Company having recognized the union as the exclusive bargaining agent for all production and maintenance workers. Local Union No. 222 was affiliated with the Oil Workers International Union C.I.O. The working conditions at the employer's plant on September 19, 1945, were governed by a contract between the union and the employer dated August 21, 1943, which contract was of continuing duration, subject to cancellation on 30 days' notice by either one of the parties. In the month of August the employer and the union began a series of conferences with reference to changes to be made in the contract requested by the union. These requests included the closed shop, double time for Sunday work and a return to the 40-hour week

for 52 hours pay. Another issue for discussion was a certain matter then pending before the National War Labor Board. These discussions continued into the month of September, and shortly before September 19, 1945, the union negotiating committee discussed with the employer's representative the possibility of a stoppage of work with a view to giving the company reasonable co-operation in an orderly shutdown of the plant to avoid damage to the equipment. By September 19, 1945, no agreement on the proposed wages or working conditions had been reached by the local union and the employer, and on that afternoon the negotiating meeting was in progress at the company's plant when pickets appeared at the entrance thereto at about 3:45 P.M. shortly before the 4:00 o'clock shift was scheduled to start work. These pickets were identified as members of Local No. 210, Oil Workers International Union, C.I.O., from the Socony Vacuum Plant at Hammond, Indiana. No members of Local No. 222 appeared on the picket line on September 19, 1945. While at this meeting the employer's superintendent received information over the telephone that there were pickets at the entrance of the plant and he informed the others at the meeting of this fact. Shortly after he informed the meeting of the presence of the pickets, the union negotiating committee went out and talked to some of the men on the picket line and about 15 minutes later returned to the plant and requested another session. It appears that the pickets told the negotiating committee that the pickets intended to shut down the plant whether Local No. 222 did it or not. It also appeared that a member of the negotiating committee asked permission of the pickets to go through their line to resume negotiations with the superintendent toward the shutting down of the plant. The conference was then resumed and the plant superintendent was informed that the pickets were serious but that the pickets were willing to permit the men to come through the picket line if the

superintendent wanted to shut the plant down. At that point, the superintendent and the union negotating committee had some discussion with reference to the crossing of the picket line by the members of Local No. 222 and the superintendent was assured that the members of that union would not cross the picket line but would respect it, and he then stated that the only thing which remained to be done was to proceed to shut down the plant. It appears that the superintendent expressed doubt as to why Local No. 210 should have anything to do with shutting down the plant since he had been dealing with Local No. 222. It appears that he was informed by the acting chairman of the union negotiating committee that the men would not cross the picket line and that the superintendent then asked the men how they wanted to proceed to shut down. The shutdown commenced immediately, some of the employees being told not to report back to work on the following day before they even knew there was a picket line. It took three days to complete the shutdown and the plant remained closed until October 8, 1945, when the Navy Department took over the operation of the plant, pursuant to a Presidential Executive Order. The matters in dispute were not settled at the time of reopening the plant and some of the issues had not been settled up to the date of the hearing of these claims for compensation.

It appears that these claims were filed based upon unemployment during the period from September 19 to October 6, 1945, and that a deputy of the Department of Labor investigated the circumstances and found that the interruption of work amounted to a stoppage of work within the meaning of the Unemployment Compensation Act, and that the plaintiffs were disqualified and were ineligible for the benefits for the period involved. The plaintiffs then appealed to the director on the ground that the stoppage of work was created by the pickets established by another local union representing workers of another

employer. The Director of Labor designated his representative to hear the evidence on the appeal which was heard on February 1, 1946. On September 16, 1946, the Director of Labor announced his decision confirming the prior ruling and holding that the plaintiffs were ineligible for benefits under the disqualification provisions of section 7(d) of the act. The plaintiffs then filed their complaint under the Administrative Review Act asking the circuit court to reverse the decision of the Director of Labor and on March 31, 1949, the circuit court of Cook County confirmed the decision.

The plaintiffs contend that the stoppage of work did not result from any act or conduct of their own, and that they should not be precluded from compensation benefits because of a stoppage created by outside intervention. They further contend that the stoppage was created by the acts of the employer who desired to bring about an orderly shutdown in order to prevent damage to the machinery, and that, if the employer had not ordered the shutdown, the plaintiffs would have carried on negotiations independently of the outcome of the negotiations that the strangers in the picket line had with their employer.

The Director of Labor contends that the plaintiffs were either participating in, or financing or directly interested in, the labor dispute which caused the stoppage of work, or belonged to a grade or class of workers of which immediately before the commencement of the stoppage there were members employed at the Texas Company's premises, some of whom were participating in or financing or directly interested in the dispute.

We have held that the Administrative Review Act makes the decision of the Director of Labor binding upon this court unless manifestly against the weight of the evidence. (*Local No. 658* v. *Brown Shoe Co.* 403 Ill. 484.) Likewise, we have stated that we do not intend to use this court as a final arbitrator in every dispute upon conflicting issues

of fact unless they are decided against the manifest weight of the evidence. *Outboard, Marine & Manufacturing Co. v. Gordon,* 403 Ill. 523.

Section 7 of the Unemployment Compensation Act (Ill. Rev. Stat. 1945, chap. 48, par. 223,) provides: "An individual shall be ineligible for benefits * * * (d) For any week with respect to which it is found that his total or partial unemployment is due to a stoppage of work which exists because of a labor dispute at the factory, establishment, or other premises at which he is or was last employed, provided, that this subsection shall not apply if it is shown that (1) He is not participating in or financing or directly interested in the labor dispute which caused the stoppage of work and (2) He does not belong to a grade or class of workers of which immediately before the commencement of the stoppage, there were members employed at the premises at which the stoppage occurs, any of whom are participating in or financing or directly interested in the dispute; provided, that if in any case separate branches of work which are commonly conducted as separate businesses in separate premises are conducted in separate departments of the same premises, each such department shall, for the purpose of this subsection, be deemed to be a separate factory, establishment, or other premises."

This court has held in the case of *Local Union No. 11 v. Gordon,* 396 Ill. 293, that the term "labor dispute," within the meaning of section 7(d) of the act, is any controversy concerning wages, hours, working conditions or terms of employment. This definition has been followed in later cases decided by this court, namely, *Fash v. Gordon,* 398 Ill. 210, and *Local No. 658 v. Brown Shoe Co.* 403 Ill. 484. We, therefore, believe that in the case at bar there was a labor dispute in existence at the Texas Company Lockport plant. It clearly appears from the evidence that the negotiations between Local 222 and the employer

were unsettled. It also appears that there was an industry-wide dispute between the International Oil Workers Union represented by its several local unions and the various refining companies in which the identical wage issue as involved here was unsettled. It is also to be noted that at the time work stoppage started many other refineries had already closed because of strikes. The fact that the United States government, pursuant to an executive order of the president, did on October 4, 1945, order many oil refineries, including the one involved in this case, affected by the stoppage of work to be taken over and operated by the Department of the Navy indicates that there was a general dispute between employees and employers in this type of business throughout the country. We believe that the finding of the Director of Labor to the effect that the negotiations at the Lockport works were merely a part of an over-all series of negotiations between the International Oil Workers Union and other refineries in which its local unions were established is not contrary to the manifest weight of the evidence. In the case of *Fash* v. *Gordon*, 398 Ill. 210, we stated, "The statute does not differentiate between the stoppage of work caused by the employer and one brought about by the employees, provided the stoppage is caused by a labor dispute. While it is probable that most stoppages of work caused by a labor dispute arise from a strike of the employees, yet it may occur from the employer's inability to operate because of matters arising out of the labor dispute. But, the statute plainly says the employee is ineligible for benefits if the work stops because of such labor dispute. The statute does not undertake to consider which party is responsible for the stoppage, the material element being is there a stoppage of work caused by a labor dispute." We believe that the question as to who was responsible for the stoppage is not really material to a decision in the case at bar. Even if such a question is material we do not find any evidence in the record which

indicates that the decision of the Director of Labor was erroneous on this issue in the case. Certainly, the employer in the case at bar, being aware of the general wage dispute in the refinery business, could reasonably assume that, since the union with which the employer was dealing was affiliated with the national union, the members of this union employed by it would respect a picket line made up of employees of the same international union from another plant. We believe that the evidence clearly indicates that the unemployment of the plaintiffs, regardless from what angle it is viewed, inevitably traces back to the labor dispute as the effective cause thereof.

The plaintiffs have relied heavily upon the case of *Outboard, Marine and Manufacturing Co.* v. *Gordon,* 403 Ill. 523, in support of their contention that they are entitled to compensation. The facts in that case are clearly distinguished from those in the case at bar, since in that case office and cafeteria employees had absolutely no dispute with the employer, their demands for wages and working conditions having been fully settled before the stoppage of work began. In the case at bar the dispute was unsettled. In the *Outboard case* the stoppage of work for the office and cafeteria employees was brought about by the strike of factory employees and resulted from an arrangement reached between the employer and the striking union to which arrangement the office workers and cafeteria workers were not parties. The stoppage in the case at bar resulted from a conference not between the Texas Company and the pickets but between Local 222 and the Texas Company. There is no showing in the case at bar of any threat of violence. In the case at bar the plaintiffs were directly interested in the labor dispute which caused the stoppage. In the case of *American Brake Shoe Co.* v. *Annunzio,* 405 Ill. 44, we held that employees are ineligible for unemployment compensation where they elect not to cross the picket line established by other employees from another

plant of the same employer who are members of a different labor union. We held that they must be regarded as either participating in the labor dispute which caused the picketing or being voluntarily unemployed because they did not care to cross the picket line. We cannot see how the plaintiffs in this case can be any more entitled to benefits than plaintiffs were in the *American Brake Shoe case* because the substance of the terminating arrangements of the negotiations merely were that both the union and the employer understood that Local Union 222 would respect the picket line and, therefore, there would be a work stoppage.

For the reasons stated in this opinion, the judgment of the circuit court of Cook County is affirmed.

*Judgment affirmed.*